THE TOWN TOBACCONIST, A PROPRIETORSHIP, A SHOP CALLED EAST OF CHERRY HILL, INC., A NEW JERSEY CORPORATION, ANNIE HULL'S, A PROPRIETORSHIP, EAST-WEST, A PROPRIETORSHIP, FOREVER CHANGES, A PARTNERSHIP, HIGH OL' TIMES, A PROPRIETORSHIP, HIGH SUPPLY, INC., A NEW JERSEY CORPORATION, INDIAN COTTAGE, INC., A NEW JERSEY CORPORATION, INNER CIRCLE, A PROPRIETORSHIP, INNER DIMENSIONS, A PROPRIETORSHIP, INNER EYE, A PROPRIETORSHIP, JACK'S MUSIC, A PROPRIETORSHIP, MA-RAJA, INC., A NEW JERSEY CORPORATION, NATURE'S HEAD, A PROPRIETORSHIP, SMUGGLER'S ATTIC OF WILLOWBROOK, INC., A NEW JERSEY CORPORATION, AMSUN WORLD IMPORTS, INC., A NEW JERSEY CORPORATION, AHEAD OF OUR TYME, A PROPRIETORSHIP, TURNTABLE, A PROPRIETORSHIP, GEORGE DICKINSON, SANDY WILSON, MICHAEL SAITZ, MIKE HULL, ANNIE HULL, ALEX SUVINO, RICHARD COOK, BRUCE KESSLER, BRUCE SHORE, LARRY WARD, VIJAY GUPTA, JOSEPH ASERO, BARBARA ASERO, GLORIA BUBBLO, GLORIA KIRKPATRICK, JACK ANDERSON, CHAMP TAILOR, ERIC KNOEDLER, SOL INSPECTOR, TOM BAHMER, PAT BAHMER, KEN TERSTEN, JESSIE ROE, JOHN SMITH, A FICTITIOUS NAME, MARY SMITH, A FICTITIOUS NAME, AND XYZ CORPORATION, A FICTITIOUS NAME, PLAINTIFFS-APPELLANTS, v. IRWIN I. KIMMELMAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued January 10, 1983—Decided July 19, 1983.

Philip Rosenbach argued the cause for appellants (*Lowenstein, Sandler, Brochin, Kohn, Fisher & Boylan,* attorneys; *Philip Rosenbach* and *Roger A. Lowenstein,* on the brief).

*Daniel Louis Grossman,* Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

WILENTZ, C.J.

█ The statute before us, New Jersey's Drug Paraphernalia Act, *N.J.S.A.* 24:21–46 to –53, seeks to criminalize "head shops," to put them out of business. It has never been enforced, the

parties having consented to an injunction against such enforcement pending the outcome of this appeal. Given the illegal conduct on which these stores thrive, the attainment of the goal of the statute is clearly within the power of the Legislature. The question is whether the means selected by the Legislature to achieve that goal are constitutional. We hold that, measured against plaintiffs' attack, this drug paraphernalia law is constitutional; that the typical "head shop" operation implicitly assumed in this opinion (since the record does not supply the complete details of an actual "head shop" operation) is criminal; and we suspect that, in fact, the conduct of most New Jersey "head shops" could be found by a jury to constitute a crime.

We are aware, as the Legislature undoubtedly was, that many people smoke or have smoked marijuana, and have used "drug paraphernalia" in doing so. Given that fact, there is obviously some question about the effectiveness of laws aimed, directly or indirectly, at preventing such conduct, especially when the methods of distribution are so diverse. The effectiveness of such a law, however, is not within the courts' province; the judiciary's sole function here is to decide whether the law is constitutional and within the power of the Legislature.

I.

On October 29, 1980, the Legislature passed a bill, commonly referred to as the Drug Paraphernalia Act (the Act), *N.J.S.A.* 24:21–46 to –53 (*L.*1980, *c.* 133), supplementing the New Jersey Controlled Dangerous Substances Act. *N.J.S.A.* 24:21–1 to –53. The Act imposes criminal penalties for dealing in various ways with drug paraphernalia.

Plaintiffs are a group of retail merchants whose businesses fall within the statute's proscriptions. They operate "head shops." They claim the Act is void for vagueness, is unconstitutionally overbroad and chills their First Amendment rights. On the effective date of the Act, plaintiffs filed a complaint challenging its constitutionality and sought a permanent injunction.

A consent order issued enjoining enforcement of the Act pending trial.

The only witness to testify at trial was the owner of a New Jersey retail establishment called "Inner Dimensions." She admitted that in her store she sold bongs, waterpipes, rolling papers, and other implements specifically listed as drug paraphernalia.[1] She claimed, however, the statute was vague and incomprehensible, primarily because she could not be certain whether the items she sold were covered by the Act.

The trial court ruled that the statute was unconstitutionally vague, specifically holding that the statute's definition of drug paraphernalia is unclear. That definition, essentially, is: any item "used or intended for use" in connection with certain activities (e.g., smoking marijuana) that violate the controlled dangerous substances laws. *N.J.S.A.* 24:21–1 to –53. The trial court stated:

> The phrase "used or intended for use", that appears a dozen times renders the definition of drug paraphernalia unlawfully vague. It is impossible for any retailer to know whose use or whose intention he must be aware of.

The Attorney General appealed to the Appellate Division, which reversed. 186 *N.J.Super.* 449 (1982). In between the trial court and Appellate Division decisions, the Supreme Court of the United States decided *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 *U.S.* 489, 102 *S.Ct.* 1186, 71 *L.Ed.*2d 362 (1982), upholding the constitutionality of an ordinance requiring businesses to obtain licenses before selling any item "designed or marketed for use with illegal cannabis or drugs." The Appellate Division, relying, in part, on *Hoffman Estates,*

---

[1] Those implements referred to in the vernacular as bongs, carburetor pipes, chillums, water pipes, roach clips, carburetion masks or rolling papers can all be used for smoking marijuana. Miniature spoons, razor blades or vials, also often found in "head shops," are commonly used in connection with the ingestion of cocaine. "Head shop" is a slang term that denotes a retail establishment whose business, in whole or in part, involves the sale of literature or equipment dealing with the cultivation or use of controlled dangerous substances.

rejected the trial court's finding that the statute's definition of drug paraphernalia was vague and concluded that none of its challenged substantive provisions violated the Constitution. We granted certification. 91 *N.J.* 248 (1982).

We affirm and hold the Act free of the asserted constitutional infirmities.[2]

---

[2]The definitional section and three of the operative sections of the Act are: *N.J.S.A.* 24:21–46. Drug paraphernalia, defined; determination

As used in this act, "drug paraphernalia" means all equipment, products and materials of any kind which are used or intended for use in planting, propagating, cultivating, ... inhaling, or otherwise introducing into the human body a controlled dangerous substance in violation of the provisions of the act to which this act is a supplement. It shall include, but not be limited to: a. kits used or intended for use in planting, propagating, cultivating, growing or harvesting of any species of plant which is a controlled dangerous substance or from which a controlled dangerous substance can be derived; b. kits used or intended for use in manufacturing, compounding, converting, producing, processing, or preparing controlled dangerous substances; ... k. objects used or intended for use in ingesting, inhaling, or otherwise introducing marihuana, cocaine, hashish, or hashish oil into the human body, such as (1) metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls; (2) water pipes; (3) carburetion tubes and devices; (4) smoking and carburetion masks; (5) roach clips, meaning objects used to hold burning material, such as a marihuana cigarette, that has become too small or too short to be held in the hand; ... and (13) ice pipes or chillers.

In determining whether or not an object is drug paraphernalia, the trier of fact, in addition to or as part of the proofs, may consider the following factors: a. statements by an owner or by anyone in control of the object concerning its use; b. the proximity of the object to illegally possessed controlled dangerous substances; c. the existence of any residue of illegally possessed controlled dangerous substances on the object; ... i. the existence and scope of legitimate uses for the object in the community; and j. expert testimony concerning its use.
24:21–47. Use or possession with intent to use, disorderly persons offense

It shall be unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, ... inhale, or otherwise introduce into the human body a controlled dangerous substance in violation of the provisions of the act to which this act is a supplement. Any person who violates this section is guilty of a disorderly persons offense.

## II.

The use of marijuana and cocaine is clearly illegal in New Jersey. *N.J.S.A.* 24:21–20. Given that fact, it is somewhat astonishing to observe the open operation of stores—"head shops"—that specialize in the sale of drug paraphernalia, namely, items that are commonly used with controlled dangerous substances and are clearly intended by the store owner to attract those who would so use them. This litigation, along with similar litigation in other states that have passed laws prohibiting the sale and use of drug paraphernalia, arises not because there is any doubt about the Legislature's power to criminalize conduct so clearly designed to facilitate or encourage other illegal conduct. The litigation arises rather from the asserted difficulty in distinguishing with sufficient clarity the sale of the same article, a pipe, for instance, by two different merchants—and making one sale criminal and the other not.

■ Generally speaking it is both legally permissible and, through careful drafting, entirely feasible to criminalize this kind of conduct only where the actor intends that the goods be used in connection with the illegal use of drugs or knows that it is highly probable that they will be so used. The perception of difficulty in drawing this distinction stems both from the earlier

---

24:21–48. Distribute, dispense or possession with intent to distribute or manufacture, crime of fourth degree

It shall be unlawful for any person to distribute or dispense, or possess with intent to distribute or dispense, or manufacture with intent to distribute or dispense, drug paraphernalia, knowing that it will be used to plant, propagate, cultivate, ... inhale or otherwise introduce into the human body a controlled dangerous substance in violation of the provisions of the act to which this act is a supplement. Any person who violates this section commits a crime of the fourth degree.

24:21–49. Advertising to promote sale, crime of fourth degree

It shall be unlawful for any person to place in any newspaper, magazine, handbill, or other publication any advertisement, knowing that the purpose of the advertisement in whole or in part, is to promote the sale of objects intended for use as drug paraphernalia. Any person who violates this section commits a crime of the fourth degree.

statutory attempts to do so as well as from the most recent attempts of which the Act is typical. The principal deficiency of the earlier laws was their failure to require explicitly that such intention or knowledge was a pre-condition to criminal responsibility. See, *e.g.,* ordinances held unconstitutional in *Music Stop, Inc. v. City of Ferndale,* 488 *F.Supp.* 390 (E.D.Mich.1980); *Knoedler v. Roxbury Twp.,* 485 *F.Supp.* 990 (D.N.J.1980); *Bambu Sales, Inc. v. Gibson,* 474 *F.Supp.* 1297 (D.N.J.1979). The deficiency of the more recent statutes, including those patterned after the Model Act referred to *infra* at 99, is that they may have over-corrected the deficiency of the earlier statutes by not only explicitly requiring such criminal intent but by repeating the requirement so many times as to lend some credibility to the claim that the statute is unclear.[3]

To the extent that the Act's language does not clearly differentiate those activities that are legal from those that have been criminalized, its purpose and history supply whatever clarity is needed, as we point out later in this opinion. This differentiation based on the actor's intent or knowledge is not required by any constitutional mandate or other fundamental principle (or at least no one is so arguing, nor do we believe such an argument would have any force): the Legislature presumably could criminalize the sale of any article that facilitates the illegal use of marijuana or cocaine regardless of the actor's state of mind. For example, the Legislature could presumably absolutely prohibit the sale of pipes, concluding that while the article has nonobnoxious uses, its potential criminal uses call for its total

---

[3]We should be clear about what is *not* the problem in this case. The fact that the Act allows some merchants to sell items while other merchants may not is not a problem. It is simply one of many examples in the criminal law where the actor's intention or knowledge renders otherwise innocent conduct criminal. Similarly, the fact that the Act may, in putting some merchants out of business, simply cause customers to go elsewhere for drug paraphernalia is not a legal problem. That a particular criminal sanction may not effectively eliminate the conduct sought to be prohibited does not render it invalid.

abolition in our society.[4] The value judgment has been made differently, however, the Legislature having concluded that a differentiation would better serve societal interests. The problem that the differentiation causes is not one of prohibiting some kind of activity that is constitutionally protected, but rather one of not setting forth that which is prohibited with sufficient clarity to give fair warning to those affected.

Since the major thrust of plaintiffs' attack is their contention that the law is impermissibly vague, our task is to construe those provisions whose clarity is at issue. Within limits, our construction may provide some clarity of meaning that may not have been there initially. We begin by examining the Act's purpose and legislative history. With the Act construed in that light, we then measure it against the constitutional challenges asserted by plaintiffs. In this connection *Hoffman Estates*, though involving a significantly different "head shop" regulation (a municipal ordinance licensing the sale of drug paraphernalia), is helpful in reminding us of some applicable constitutional principles:

> In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications. [455 *U.S.* at 494–95, 102 *S.Ct.* at 1191, 71 *L.Ed.*2d at 369 (footnotes omitted)].

That case also provides further guidance for us in deciding whether the Act is unconstitutionally vague, for that was precisely the contention made there (and rejected by the United States Supreme Court) concerning a drug paraphernalia ordinance.

---

[4]In *Hoffman Estates,* 455 *U.S.* at 497–98 n. 9, 102 *S.Ct.* at 1192–93 n. 9, 71 *L.Ed.*2d at 370–71 n. 9, the Supreme Court suggests such a total prohibition might be valid.

■ We shall confine our inquiry into the validity of the Act to its impact on retailers. We do so for three reasons: first, because all of the plaintiffs are retailers; second, because there is no need to go further since a pre-enforcement attack on vagueness grounds generally fails if the Act is clear in one of its applications (and we find it clear in its application to retailers); and, third, because we know of no doctrine that requires a court to consider and determine the validity of every hypothetical application of legislation when a pre-enforcement vagueness attack is involved. *Hoffman Estates,* 455 *U.S.* at 494–95, 102 *S.Ct.* at 1186, 71 *L.Ed.2d* at 369. We note, however, without deciding, from the analysis that follows, that the Act appears sufficiently clear in all of its other major applications to withstand a similar constitutional attack.

### III.

The New Jersey drug paraphernalia law, *N.J.S.A.* 24:21–46 to –53, is closely patterned after the Model Drug Paraphernalia Act (Model Act), which was drafted by the Drug Enforcement Agency of the United States Department of Justice at the request of state and other federal authorities. Because of the close parallel between New Jersey's statute and the almost identical Model Act, we begin our analysis with an examination of the Model Act and its legislative history and purpose. *See GATX Terminals Corp. v. New Jersey Dep't of Envtl. Protection,* 86 *N.J.* 46, 53 (1981); *Galloway Twp. Bd. of Ed. v. Association of Educ. Secretaries,* 78 *N.J.* 1, 10 (1978).

Much of the impetus for the drafting of the Model Act is attributable to the recognition that, over the past decade, an extensive industry has developed that concentrates on the manufacture and sale of paraphernalia used with illegal drugs, primarily marijuana and cocaine. Sales of drug paraphernalia have reached major proportions, with estimates of total sales ranging from several hundred million to several billion dollars annually. *Drug Paraphernalia: Hearing Before the House of*

*Representatives Select Committee on Narcotics Abuse and Control,* 96th Cong., 1st Sess., 95 (Statement of Irvin Nathan, Deputy Assistant Attorney General, U.S. Department of Justice) (1979) (hereafter cited as Hearing); Prefatory Note, Model Act.

The Model Act explicitly reflects the belief that the unregulated sale and advertising of drug paraphernalia contributes to the widespread use of illegal drugs. The Model Act's drafters felt that the drug paraphernalia industry "promotes, even glamorizes, the illegal use of drugs by adults and children alike," Prefatory Note, Model Act, and others suggested that the unrestricted sale of drug paraphernalia "leads children to believe that the controlled substances they are designed to administer are equally accepted and legal." Hearing, at 1 (Remarks of Cong. Evans).

The drafters of the Model Act noted that the Uniform Controlled Substances Act, which has been enacted in most states, does not control the manufacture, sale, advertisement or use of drug paraphernalia, and that state laws designed to control paraphernalia proliferation were often too limited in coverage to be very effective. Prefatory Note, Model Act. To remedy these perceived deficiencies, the drafters attempted to formulate a model statute that was extremely broad in scope.

This can be seen initially in the Model Act's definition of drug paraphernalia. Recognizing that the variety of items used in conjunction with illicit drugs is limitless, the drafters did not confine the Model Act's definition of drug paraphernalia to an item-by-item delineation of proscribed devices. Instead, the Model Act defines drug paraphernalia as

> all equipment, products and materials of any kind which are used, intended for use, or designed for use, in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance .... [Model Act, Article I].

The Model Act provides that this general definition of drug paraphernalia "includes, but is not limited to," and there then

follow 12 more or less specific examples of drug paraphernalia (each one of which is qualified by the "used, intended for use, or designed for use" language), the 12th itself including 13 more specific examples. Finally, the definitional section lists factors ("in addition to all other logically relevant factors") that "a court or other authority should consider" in determining "whether an object is drug paraphernalia." This tabulation functions merely as a guide and was not intended as either a mandatory or an inclusive list of factors to be considered. Comment to Model Act, Article II. As noted later, we have concluded that these factors, to the extent appropriate in a particular case, should be considered as bearing on the intent or knowledge of the defendant, *i.e.,* his state of mind, rather than on whether an article is or is not drug paraphernalia.

The broad scope of the Model Act is further evident in its catalog of proscribed activities. Assuming the requisite intent is proven, the Model Act criminalizes the use or possession of drug paraphernalia (Article IIA), the manufacture or delivery of drug paraphernalia (IIB), and the advertisement of drug paraphernalia (IID). Delivery of drug paraphernalia to a minor is made a special offense (IIC). Finally, the Model Act provides for the civil seizure and forfeiture of drug paraphernalia (Article III). Through this sweeping criminalization of all dealings in these items when intended to facilitate use of controlled dangerous substances and through the additional provision of the independent civil remedy of seizure and forfeiture, the Model Act plainly was intended to encourage legislation that would contain enforcement tools capable of effectively attacking the large-scale challenge presented.

The drafters of the Model Act were not concerned solely with designing an all-inclusive statute. A second major impetus for the Model Act was the earlier failure of state and local legislation to withstand legal challenges. Although 43 states and numerous localities had proposed or enacted anti-paraphernalia statutes at the time the Model Act was drafted, those statutes had "not fared well against legal and constitutional challenges."

Hearing at 2 (Remarks of Cong. Evans). The Model Act's drafters sought to create a statute that would withstand legal attack.

Vagueness had been the basic legal deficiency of many of the previous statutes, which often did not explain the term paraphernalia, and were silent on the state of mind that must accompany the proscribed conduct. The drafters of the Model Act sought to eliminate these problems (and, in the process, created others) by defining drug paraphernalia in terms of an article's design, use, or intended use. To assure that innocent possessors would not fall within its terms, the drafters made "knowledge or criminal intent of the person in control of an object a key element of the definition" of drug paraphernalia. Comment to Model Act, Article I. The definition of paraphernalia thus hinges "on a specific intent to violate, or to facilitate a violation of, the drug law." *Id.*

As noted above, the Model Act's definition does not expressly state whose intent is relevant. Drug paraphernalia clearly means any and all equipment designed, used or intended for use with controlled substances, but the definitional section does not clarify whether it is the defendant's design, use or intent to use, or that of someone else, that is controlling. This lack of clarity in the literal wording of the Model Act (as well as those acts, including ours, that copy it) is unfortunate, because it has engendered a good deal of confusion and was undoubtedly the cause of the trial court's ruling in this case. Merchants have argued that the Model Act is vague because it subjects them to criminal liability, regardless of their own intent, for selling an item that, unknown to them, a customer uses or intends to use with illegal drugs.

If the Model Act (and our Act as well) is read literally, the confusion of the definition is compounded by the operative sections, which define criminal behavior. For instance, Section A of Article II of the Model Act (corresponding to *N.J.S.A.* 24:21–47) makes it "unlawful for any person . . . to possess

[drug paraphernalia] with intent to use [it] ... to ... inhale ... a controlled [dangerous] substance." If one possesses an item, a pipe for instance, with the intent of using it to smoke marijuana, would such possession without more violate the Model Act? The question would remain, was the pipe "drug paraphernalia," for literally, in order to constitute a crime, it must not only be demonstrated that defendant intended to use the item with a controlled dangerous substance, but that the item itself was "drug paraphernalia." The Model Act, then, literally would require proof that defendant possessed an item that he intended to use with a controlled dangerous substance, which item was intended for use with a controlled dangerous substance, a requirement that makes no sense. Fairly, rather than literally, read, the intent requirement of the definition simply duplicates that of the operative section. In *Record Revolution No. 6, Inc. v. City of Parma,* 492 *F.Supp.* 1157, 1172–79 (N.D. Ohio 1980), the court made a painstaking analysis of the Model Act (in the form of a municipal ordinance practically identical to it) in which it thoroughly applied both the definition and operative sections. That analysis demonstrated that the intent provisions of the definition duplicated those of the operative sections in practically all possible applications. *Id.* at 1172 nn. 8 & 9. In other words, the elements of the offenses described in the Model Act would be precisely the same if the "intent" factor of the definition of drug paraphernalia were omitted.[5]

■ We believe that a construction of New Jersey's Act that eliminates the "used or intended for use" factor from the definition of drug paraphernalia is more likely to achieve fair, even-handed, predictable, and understandable enforcement and judicial application. Furthermore, we believe that such a construction completely conforms to the intention of the Model Act and New Jersey's Act as well. Such elimination will not in any

---

[5]We need not decide whether "designed for use" in the Model Act's definition of drug paraphernalia adds something significant since that phrase was eliminated from New Jersey's Act.

way jeopardize defendants since the operative sections of the Act will continue to require use, intention, or knowledge on the part of a defendant. It will go far, however, toward eliminating the confusion that apparently plagues those dealing with the Model Act and its counterparts. We therefore construe New Jersey's Act as defining drug paraphernalia, in effect, as any item capable of being used with controlled dangerous substances.

■ There is nothing unusual about our statutory construction. When a statute's constitutionality is doubtful, a court has the power to engage in "judicial surgery" and through appropriate construction restore the statute to health. *New Jersey Chamber of Commerce v. New Jersey Elec. Law Enforce. Comm'n,* 82 *N.J.* 57, 75 (1980); *Borough of Collingswood v. Ringgold,* 66 *N.J.* 350, 357 (1975), app. dism., 426 *U.S.* 901, 96 *S.Ct.* 2220, 48 *L.Ed.*2d 826 (1976); *State v. DeSantis,* 65 *N.J.* 462, 472–73 (1974).

The examples given in the definition, as well as the exhaustive general description set forth therein, remain as helpful guides for those whose conduct may fall close to or within the offenses thereafter listed in the Act, as well as those charged with enforcing the Act.

Our construction of the Act will relieve juries of the confusion that inevitably would follow an instruction that required them first to determine if an item was "drug paraphernalia" (by referring the jury to defendant's intent) and then to determine if defendant's conduct fits within the applicable operative section (again by referring the jury to defendant's intent). The requirement that the jury address itself to the same question twice must necessarily produce confusion. It simply does not make sense.

■ For similar reasons we rule that the factors listed in the definitional section of the Act—closely patterned after the Model Act—shall be used solely to aid the jury in determining whether defendant's state of mind (intent and knowledge) fits

within the particular operative section involved. *Parma* notes that the factors may be used by the jury "to determine whether the elements of an offense have been proved." 492 *F.Supp.* at 1171. Despite the Act's specific reference thereto, we do not believe that these factors should be used in determining whether an item is "drug paraphernalia." The listed factors fit quite comfortably into a category of matters relevant to defendant's intent; their use as factors in deciding whether an item fits within a definition is awkward at best and likely to produce further confusion. A reading of these factors leaves us with no doubt that they were indeed intended to enable the jury to determine the state of mind of the defendant.

With the Act thus construed, the jury will rarely have to determine as a fact question whether an item is drug paraphernalia. In practically every case it will be admitted that the item was capable of being used with controlled dangerous substances (and therefore is drug paraphernalia), the real issue being whether the defendant intended that it be used as such, or intended an innocent use. It will be a rare case in which a defendant will claim the item was simply not capable of being so used, and even in such case that claim is more likely to be a factor in determining defendant's intentions than in deciding the highly abstract question of whether an item is properly characterized as "drug paraphernalia."

This analysis and construction of the Model Act not only eliminates the confusion caused by the repeated inclusion of an intent requirement, but also makes it quite clear that it is the defendant's intention that is material, for that is the thrust of the operative sections of the Model Act. It is only in the definitional section that doubt might arise as to whose intent is covered.

■ One might contend that while this construction simplifies the Model Act, it runs roughshod over its language, which demonstrates, by the constant repetition of an intent requirement in the definition of drug paraphernalia, that something

more than defendant's intention was contemplated by the drafters of the Model Act. This contention is plausible only if the Model Act's legislative history is ignored. In Congressional hearings, counsel for the Justice Department explained that the relevant intent is that of the person charged with violating the Model Act. Pointing out that earlier state legislation had been susceptible to attacks for vagueness, counsel stated:

> The model state statute which DEA drafted and which we have reviewed attempts to avoid these problems by specifically ... including a requirement that *the defendant* have specific intent that the items be used in connection with illicit substances. [Hearing at 32 (testimony of Irvin Nathan) (Emphasis added)].

The stated purpose of requiring proof of the defendant's intent was to cure the problem of lack of notice that was one of the principal grounds for successful vagueness attacks on state statutes drafted prior to the Model Act. *Id.*

▇ The conclusion that the relevant intent is that of the defendant charged with the offense is supported further by a reading of the Comment to the Model Act, which suggests that an otherwise innocent merchant does not become guilty when a customer buys something that is later used with controlled dangerous substances.

> Consider the application of Article I [the definition section] to a spoon, a hypodermic syringe, and a length of surgical tubing. Each object has legitimate uses in the community.... Thus, when these objects are manufactured, delivered and possessed in lawful commerce, they are not considered paraphernalia. But, if these same objects are assembled and used by an addict to illegally melt heroin and inject it into his body, they become drug paraphernalia. [Comment to Model Act, Article I].

Although the items in the above Comment "become drug paraphernalia" in the addict's hands, their character in the hands of the manufacturer and merchant is not retroactively altered. It is the addict who is subject to prosecution, not the merchant who sold the items. *Ibid.*[6]

---

[6]Of course, items may become drug paraphernalia in the hands of merchants even though the items have legitimate uses. To be found guilty, the merchant "need not intend to use it personally in connection with drugs. It is

It is clear from a reading of the Model Act, the comments, and the testimony at the hearing, that there was no intention to label an item as drug paraphernalia regardless of the intent of the defendant. Rather, the purpose of the definition was to emphasize that there would be no guilt in the absence of such state of mind on the part of defendant. Indeed, the contention that the Model Act does not clarify whose intent is relevant is, upon examination, a red herring. As the non-definitional operative sections of the Model Act explicitly provide, the person charged with an offense must be shown to have used an item, have designed an item for use, or have intended an item to be used with illicit drugs in order to be proven guilty. We note further that the overwhelming majority of jurisdictions agree that the Model Act makes the intent of the defendant, rather than the intent of someone else, crucial. *See, e.g., New England Accessories Trade Ass'n v. Tierney,* 691 *F.*2d 35, 36 (1st Cir. 1982); *Tobacco Accessories and Novelty Craftsmen Merchants Ass'n of La. v. Treen,* 681 *F.*2d 378, 383 (5th Cir.1982); *Florida Businessmen for Free Enterprise v. City of Hollywood,* 673 *F.*2d 1213, 1219 (11th Cir.1982), *cert.* den., —— U.S. ——, 103 *S.Ct.* 763, 74 *L.Ed.*2d 978 (1983), 32 *Crim.Law Rptr.* 4146 (Jan. 13, 1983); *Casbah, Inc. v. Thone,* 651 *F.*2d 551, 559 (8th Cir.1981), *cert.* den., 455 *U.S.* 1005, 102 *S.Ct.* 1642, 71 *L.Ed.*2d 874 (1982).

New Jersey's statute embraces precisely the same goals as the Model Act, and is almost identical in its wording. The language of New Jersey's Act tracks the Model Act, but contains two major changes. Like the Model Act, our Act defines drug paraphernalia as any item used or intended for use with illicit drugs, and criminalizes the use, possession, manufacture, distribution and sale of drug paraphernalia. However, New Jersey's Act deletes all references to the phrase "designed for use." Thus, while the Model Act defines paraphernalia as any

enough if he holds the object with the intent to make it available to persons who he knows will use it illegally." Comment to Model Act, Article I.

item "used, intended for use or designed for use" with controlled substances, the Act here requires that an object be either used or intended for use with drugs before it may be considered illegal. This modification was made because the Legislature found that "[t]he phrase 'designed for use' is vague and only serves to jeopardize the bill's enforceability and constitutionality." Assembly Judiciary, Law, Public Safety and Defense Committee, Statement to S.1021 at 2.[7]

The other major modification of the Model Act was the elimination of the phrase "reasonably should know" from the distribution and advertising offenses.[8] The Model Act criminalizes delivery of drug paraphernalia, or possession with intent to deliver drug paraphernalia, when a person knows or reasonably should know that the article will be used with controlled substances, and it similarly criminalizes the advertisement of drug paraphernalia when the person placing the advertisement knows or reasonably should know that the advertisement's purpose is to

[7]It is not clear what case the Legislature was concerned with in this connection. The District Court in *Parma* had held the phrase valid against a vagueness attack. 492 *F.Supp.* at 1173. The Court of Appeals, however, concluded the phrase was vague. 638 *F.2d* at 930. The latter decision was reported *after* the Assembly Judiciary Committee's statement. It is possible that the Committee was familiar either with *Bambu Sales, Inc. v. Gibson,* 474 *F.Supp.* 1297 (1979), or *Record Museum v. Lawrence Twp.,* 481 *F.Supp.* 768 (1979), decisions of the United States District Court in New Jersey, both of which held that a standard including "designed for use," or something similar, was void for vagueness.

The Supreme Court of the United States has, to some extent, settled the question in *Hoffman Estates,* 455 *U.S.* at 502, 102 *S.Ct.* at 1195, 71 *L.Ed.*2d at 373–74, at least within the context of a pre-enforcement vagueness attack. It held the standard "sufficiently clear to cover at least some of the items that Flipside sold," *id.* at 502, 102 *S.Ct.* at 1195, having previously decided that "designed for use" includes "at lease an item that is principally used with illegal drugs by virtue of its objective features, *i.e.,* features designed by the manufacturer." *Id.* at 501, 102 *S.Ct.* at 1195.

[8]The "should know" phrase was left in, perhaps inadvertently, in describing a factor relevant to the advertising offense. *N.J.S.A.* 24:21–46, second paragraph, g.

promote the sale of paraphernalia. Model Act, Article IIA and D. The deletion of this phrase from New Jersey's Act results in a requirement here of actual knowledge on the part of the seller or advertiser. As with the deletion of "designed for use," the Legislature's intent was "to strengthen" the bill's constitutionality "by eliminating vague and unenforceable provisions and any dangers of arbitrary and discriminatory enforcement." Statement to S.1021, at 1. Thus, while under the Model Act a seller could be prosecuted where he reasonably should have known that his products would be used with illicit drugs, in New Jersey the Act requires the seller actually know that an item would be so used.

The Legislature made this latter change expressly in response to the District Court's opinion in *Record Revolution No. 6 v. City of Parma, Ohio,* 492 *F.Supp.* 1157 (N.D.Ohio), rev'd, 638 *F.*2d 916 (6th Cir.1980), vacated and remanded, 451 *U.S.* 1013, 101 *S.Ct.* 2998, 69 *L.Ed.*2d 384 (1981), aff'd by the Sixth Circuit in an unreported opinion, vacated and remanded, 456 *U.S.* 968, 102 *S.Ct.* 2227, 72 *L.Ed.*2d 840 (1982).[9] The District Court in *Parma,* interpreting an ordinance patterned on the Model Act and therefore almost identical to New Jersey's Act, held that the "reasonably should know" standard was unconstitutionally vague and overbroad. We must attribute particular importance to the Legislature's recognition of the District Court opinion in *Parma,* and its explicit attempt to conform New Jersey's statute to that court's interpretation of what would be constitutional. While we do not necessarily endorse the legal conclusions reached by the District Court (*accord Knoedler v. Roxbury Twp.,* 485 *F.Supp.* 990, 993 (D.N.J.1980); *contra World Imports, Inc. v. Woodbridge Twp.,* 493 *F.Supp.* 428, 433 (D.N.J.1980)), its opinion

---

[9]Also in reliance on this District Court decision, the Legislature added a severability clause and eliminated from the list of factors which can be considered in determining whether an item is drug paraphernalia, the reference to whether the person in control of the object "is a legitimate supplier of like or related items to the community."

is nonetheless significant because of the Legislature's apparent reliance on the construction and interpretation found in that opinion, which hinged criminal responsibility on the state of mind of the defendant.[10] 492 *F.Supp.* at 1166–69. Had the Legislature desired a different result, surely it would have so indicated in the bill or committee Statement.

 Having determined that the state of mind requirements of the Act are those found only in its operative sections (*N.J. S.A.* 24:21–47 through –49) and that they apply to defendant only, the sole questions of construction or interpretation remaining are those that arise from Section 48, the provision applicable to retailers of drug paraphernalia. The Act makes it unlawful for a retailer to sell drug paraphernalia "knowing" that it will be illegally used; or unlawful to possess drug paraphernalia, intending to sell same "knowing" that it will be illegally used. The only matter to be interpreted is the meaning of "knowing." [11]

---

[10]As indicated above, we differ with *Parma* in this regard only to the extent of confining the question of defendant's intent to the elements of the crime, as distinguished from literally following the Model Act, which uses intent also to determine whether an item is drug paraphernalia.

[11]We differ with the District Court and Circuit Court in *Parma,* both of which apparently concluded that this section required, in addition to a showing that the retailer "knew" the items would be illegally used, a further showing that the retailer possessed them with the intention that they be so used. 492 *F.Supp.* at 1176, 638 *F.2d* at 934–35. That analysis stemmed from the literal application of the definition of "drug paraphernalia." If that definition is imported into Section 48, it results in the requirement that the retailer not only know that the items will be so used but that when he possessed them, he so intended. In most cases, and certainly in the case of "head shops," the added requirement that the retailer's intention be proven will not require any additional proof over that which would be needed to show that he "knew" the goods would be so used. The same circumstantial proof to show the retailer's knowledge will suffice to show his intent.

As noted above, we have construed the Act to eliminate from the definition of drug paraphernalia any requirement of proof of defendant's state of mind beyond that required in the operative sections of the Act. Our conclusion was based on both the confusion engendered by this duplicative requirement

concerning defendant's state of mind as well as by the fact that in practically all instances there is absolutely nothing added, by way of elements of the offense, when the "used or intended for use" requirements of the definition of "drug paraphernalia" are added to those of the operative sections. In the case of Section 48, however, there would be an added element of proof needed if the definition were literally applied, and that is that it would have to be shown that the retailer possessed the goods intending that they be sold for ultimate illegal use *and* that when he sold them, he *knew* that they would be so used. Having concluded that the importation of this definitional requirement is, in almost all cases, productive only of confusion, we conclude that the Legislature could not have meant it to be used in the one case where, in addition to producing confusion, it adds another element that must be shown to prove an offense. Our conclusion is bolstered by the examples given in the Comment to the Model Act. In the section on "Manufacture or Delivery of Drug Paraphernalia" (Comment to Model Act, Article II) positing what is obviously an innocent possessor of goods capable of both legal and illegal uses, the Comment states:

> Section B [corresponding to *N.J.S.A.* 24:21–48] requires a supplier of *potential* paraphernalia to exercise a reasonable amount of care. He need not undertake an investigation into the intentions of every buyer, but he is not free to ignore the circumstances of a transaction. Suppliers of objects capable of use as paraphernalia must not deliver them indiscriminately. Since each element of Section B must be proven beyond a reasonable doubt, legitimate, prudent suppliers will not be affected by this section. [Emphasis added].

The drafters of the Model Act obviously contemplated that even the legitimate retailer, namely, one who possesses goods not intending that they be used illegally, can nevertheless violate this section—"he is not free to ignore the circumstances of a transaction," if he possesses "objects capable of use as paraphernalia," he "may not deliver them indiscriminately." The clear import of the Comment is that the legitimate retailer may not plead his legitimacy if the fact is that on a particular occasion, knowing that the goods were going to be used in connection with controlled dangerous substances, he nevertheless sold them.

We add that not only do we believe this was the intent of the Model Act, but we also believe it is good policy. We do not believe, for instance, that a manufacturer of goods capable of being used with controlled dangerous substances should be able to escape criminal responsibility for a sale to a jobber known to the manufacturer to supply only "head shops," by claiming that when he manufactured the goods, or held them prior to sale, he had no intention that they be used illegally.

We further observe that unlike Section 47, Section 48 does not explicitly require any showing of intent but merely a showing that the seller knew that the goods would be used illegally.

The only practical impact of this difference in construction will be to require that legitimate retailers, in most cases supermarkets, not sell items

█ The knowledge requirement of Section 48 is presumably that provided in the definition of "knowingly" found in the Code of Criminal Justice (*N.J.S.A.* 2C:2–2(b)(2)). See 2C:1–5(b), "the provisions of subtitle 1 [which include the definition of "knowingly"] of the code are applicable to offenses defined by other statutes." That definition provides that a person acts knowingly with respect to a result of his conduct if he is "aware that it is practically certain that his conduct will cause such a result." The knowledge requirement of the Model Act is satisfied when a supplier "is aware of a high probability an object will be used as drug paraphernalia." Comment to Model Act, Article II. While the two may be quite similar for practical purposes, the Code's definition should be used in charging a jury. The requirement that a seller, to be found guilty of violating the Act, must "know" that his items will be used for illegal purposes, is satisfied if he is "practically certain" that the item will so be used.[12]

---

adaptable for illegal use when they *know* that they will be so used. The requirement is not one of conducting an investigation but rather conforming one's actions to this law if, and only if, the seller actually *knows* that the buyer will use the good illegally.

[12]We note that the Code's definition of "knowingly" lists two alternatives, the latter of which we believe is applicable to this case:

A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. "Knowing," "with knowledge" or equivalent terms have the same meaning. [*N.J.S.A.* 2C:2–2(b)(2) ].

The Model Act's selection of "high probability" is not explained. It is not at all significant, however, since the Model Act includes a "reasonably should know" standard, rendering this point academic. (If one is guilty if he "reasonably should have known" something, than obviously he is guilty if he knew that it was either practically certain *or* that there was a high probability.) The Code does not seem to provide for any variation from those provisions of subtitle 1, including the definition of "knowingly," which are specifically made applicable to offenses defined by other statutes. 2C:1–5(b). We note that the District Court in *Parma*, 492 *F.Supp.* at 1176 n.

That there is very little practical difference between a requirement that the state prove both the retailer's intent and his knowledge is suggested by the District Court in *Parma,* which found that the Model Act allows proof of a seller's intent to be based on the seller's knowledge that an item would be used by a purchaser as drug paraphernalia. As the Comment to the Model Act notes:

> The seller may not ignore the purpose for which the purchase is made if he is advised of that purpose, or wash his hands of the aid that he has given the perpetrator of a felony by the plea that he has merely made a sale of merchandise. ... [N]ot only does the act of the seller assist in the commission of the felony, but his will assents to its commission, since he could refuse to give the assistance by refusing to make the sale. [Comment, Article II, quoting *Backun v. United States,* 112 *F.*2d 635, 687 (4th Cir.1940)].

This interpretation further confirms the Act's applicability to the "innocent" retailer and accords with basic precepts of criminal law. One is held normally to intend a result of his act when he consciously desires that result, or "when he knows that that result is practically certain to follow from his conduct, whatever his desire may be as to that result." LaFave and Scott, *Criminal Law,* § 28 at 196 (1st ed. 1972).

Precisely because it found that proof of a seller's intent could be based on the seller's knowledge of the buyer's intent, the *Parma* court held the phrase "reasonably should know" was unconstitutional, for it impermissibly allowed a finding of intent even though the sole factor—actual knowledge of probable use—might, in the case of an "unreasonable" defendant, be missing. In other words, it allowed such finding of intent on the basis of imputed rather than actual knowledge. The "reasonably should know" standard was flawed, according to the

---

11, apparently concluded that the parallel provisions of the Model Penal Code would result in a conclusion that "knowing" meant that the actor was aware of a high probability that a certain result would occur; the conclusion is not explained. Our conclusion is based very simply on the fact that the first alternative meaning of "knowingly" in the Code does not seem nearly as applicable, indeed it seems clearly inapplicable, to the situation at hand.

District Court, because it focused on "the weakness of an individual's ability to perceive rather than his criminal intent," 492 *F.Supp.* at 1174, and left the seller in an untenable situation:

> Certainly in a case where the purchaser announces his or her intention to utilize the paraphernalia purchased for an illegal purpose, the seller would be placed in no dilemma; however, the question arises as to what would create a reasonable belief in the mind of the seller in the absence of such an unlikely announcement by the purchaser. Does the purchaser's age, sex, mannerisms or dress afford to a seller reason to believe that the paraphernalia will be used for an illegal purpose? Or should the nature of the purchaser's companions or the items he or she carries be determinative? These questions indicate the difficulty that a merchant, as well as a law enforcement officer, would have, in the absence of an admission by the purchaser, in determining what gives rise to a reasonable belief that a purchaser intends to utilize the paraphernalia for an illegal purpose. [*Id.* at 1173, quoting *Knoedler v. Roxbury Twp.,* 485 *F.Supp.* 990, 993 (D.N.J.1980)].

Accordingly, while a prosecution of a seller could not be based merely on the intent of the purchaser, the court found that where the seller *knew* of the buyer's intent, this knowledge could not be disregarded. The District Court's holding was not that what one should reasonably know may not trigger criminal liability (the defendant who kills, honestly believing self-defense requires it, is criminally responsible if his belief was unreasonable), but rather that the circumstances of this particular crime render the "reasonably should know" standard impermissibly vague. Nevertheless, even though New Jersey's Act has eliminated this standard, it is quite clear that while the seller "need not undertake an investigation into the intentions of every buyer ... he is not free to ignore the circumstances of a transaction." Comment to Model Act, Article II. If those circumstances inform him in fact that it is practically certain his goods will be used for these illegal purposes, his sale constitutes a violation of the Act, even though his original possession was innocent.

The District Court's construction of the Model Act in *Parma* is not without controversy. Several courts have interpreted state statutes derived from the Model Act in a manner that suggests that the seller's knowledge of the buyer's intent cannot function

as proof of the seller's intent.[13] However, we need not deal with this issue since we conclude it is the seller's knowledge, not his intent, that is critical. Here we emphasize the reasoning for the Legislature's deletion of the phrase "reasonably should know." The purpose of this deletion is to require that actual knowledge, *i.e.,* knowledge that the illegal use is practically certain, be shown beyond a reasonable doubt; as stated in *Parma,* "it is not sufficient to show that the defendant may have suspected or thought" an item would be used with illicit drugs. 492 *F.Supp.* at 1176.

██ Some of the more typical problems should be addressed. A prosecution of a merchant for the sale of drug paraphernalia cannot be based solely on the fact that a purchaser used an item with controlled dangerous substances. Rather, the Act requires proof that the seller distributed the item "knowing" it would be so used. Of course, a seller may contend (as appellants here point out) that his knowledge is innocent since his intent is merely to make a profit. Obviously, however, a seller's intent includes more than this ultimate goal. Most often, the seller intends to attract a particular market perhaps by clearly indicating a particular use for his goods. The "head shop" operator intends to make money by attracting those who would buy and use drug paraphernalia illegally. All of the natural consequences of his actions are intended—the attraction of that market, the illegal use of his goods, and the resulting profit; the

---

[13]*See, e.g., New England Accessories Trade Ass'n v. Tierney,* 691 *F.2d* 35, 36–37 (1st Cir.1982); *Delaware Accessories Trade Ass'n v. Gebelein,* 497 *F.Supp.* 289, 294 (D.Del.1980); *Mid-Atlantic Accessories Trade Ass'n v. Maryland,* 500 *F.Supp.* 834, 845 (D.Md.1980). Under the interpretation favored by these courts, "the legitimate merchant" who does not intend that his innocuous wares be used with illegal drugs "need make no judgment about the purpose of the buyer based upon the surrounding circumstances." *Delaware Accessories Trade Ass'n v. Gebelein,* 497 *F.Supp.* at 294. Further, even the dealer who *intends* illicit use of the items he sells is safe "as long as he does not actually know the buyer's purpose and as long as the objective facts that are there for him to observe do not give fair notice that illegal use will ensue." *Id.*

means are intended as well as the end. His "defense"—the profit motive—is no more persuasive than if used by a killer-for-hire.

Knowledge here can be proven by a seller's statements to a purchaser, a purchaser's statements to a seller, or from instructions given by the seller on the use of an item with drugs. Typically, perhaps, knowledge will be shown circumstantially by a pattern of marketing that suggests or encourages the use of an object in conjunction with illegal drugs and a pattern of purchasing (known to defendant) that suggests its success. *See Knoedler v. Roxbury Twp.*, 485 *F.Supp.* 990, 994 (D.N.J.1980). *Cf. Hoffman Estates*, 455 *U.S.* at 502–03, 102 *S.Ct.* at 1195–96, 71 *L.Ed.2d* at 374 ("marketed for use" standard provable through reference to a retailer's intentional display and marketing of merchandise).[14]

Mere suspicion of a purchaser's intent, based on such characteristics as a purchaser's age, dress, length of hair or musical preferences, will not suffice to show the quality of knowledge that could function as proof under the Act. Neither will the seller's generalized knowledge that a certain percentage, however small, of purchasers inevitably intend to use an item illegally suffice. Every grocery store owner knows that regardless of all precautions, some purchasers of plastic bags will store marijuana in those bags, but this is not the actual knowledge intended by the Legislature. That grocer must, in order to violate the law, know that it is practically certain that a specific item will be illegally used, rather than know that there is a high statistical probability that out of thousands of these items one will be used for that purpose. His situation should be contrast-

---

[14]"Marketing" refers here to an organized pattern of sales, regardless of the place of sale. One who markets goods, knowing it is practically certain they will be used with controlled substances, is subject to prosecution even if the sales are made out of one's home or on the street rather than from a traditional retail outlet.

ed with the "head shop" operator who knows that it is practically certain that *every* item adaptable for illegal use will be so used.

In the conventional case, the day the "head shop" opens for business, its owner is subject to prosecution if, by virtue of the circumstances (*e.g.*, the prior advertising of the opening, the arrangement of the goods for marketing purposes, the signs on the store, the literature contained within the store, the characteristics of the goods, etc.) a reasonable person could conclude beyond a reasonable doubt that the operator in possession of those goods, intending to sell them, was practically certain that purchasers would use them illegally with controlled dangerous substances. Actual sales might ease the way of the prosecution but they are not legally required. The legitimate merchant's problem with the law will occur only in those situations where, despite his lack of criminal intention, it becomes apparent to him that, as to a particular sale, it is practically certain that such illegal use will occur—for instance in the unlikely event that a purchaser openly admits to such intended use.[15]

Having examined the purpose and structure of the drug paraphernalia law, and having resolved the interpretational problems suggested by this case, we now will examine plaintiffs' particular objections to the law.

---

[15]It would be possible, by giving full effect to the definition of "drug paraphernalia," to insulate even such a sale by a legitimate merchant. For instance, since that merchant when he possessed the goods never intended that they be used for illegal purposes, the conclusion could be reached that they were not "drug paraphernalia," and therefore his sale, even though he was practically certain they would be so used, would not violate the Act since it would not be a sale of "drug paraphernalia." As noted above, we have rejected a literal application of the definitional section, and we believe the result suggested in the text above conforms to the intention of the Model Act. See Comment to Model Act, Article II.

## IV.

We first consider whether the Act is facially vague. Clear and comprehensible legislation is a fundamental prerequisite of due process of law, especially where criminal responsibility is involved. Vague laws are unconstitutional even if they fail to touch constitutionally protected conduct, because unclear or incomprehensible legislation places both citizens and law enforcement officials in an untenable position. Vague laws deprive citizens of adequate notice of proscribed conduct, *Lanzetta v. New Jersey,* 306 *U.S.* 451, 453, 59 *S.Ct.* 618, 619, 83 *L.Ed.* 888, 890 (1939), and fail to provide officials with guidelines sufficient to prevent arbitrary and erratic enforcement. *Papachristou v. City of Jacksonville,* 405 *U.S.* 156, 162, 92 *S.Ct.* 839, 843, 31 *L.Ed.* 2d 110, 115 (1972). In *Grayned v. City of Rockford,* 408 *U.S.* 104, 108–09, 92 *S.Ct.* 2294, 2298–99, 33 *L.Ed.2d* 222, 227–28 (1972), the Supreme Court explained why vague laws are intolerable:

Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications. (footnotes omitted).

A law is void as a matter of due process if it is so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.,* 269 *U.S.* 385, 391, 46 *S.Ct.* 126, 127, 70 *L.Ed.* 322, 328 (1926).

We will deal with the vagueness challenge only in one aspect: from the point of view of a retailer, since that is the position of plaintiffs. If not vague in this respect, the statute would survive this pre-enforcement vagueness challenge, for all

that is required is to show that it is not "impermissibly vague in *all* its applications." *Hoffman Estates,* 455 *U.S.* at 495, 102 *S.Ct.* at 1192, 71 *L.Ed.*2d at 369. Additionally, however, it is apparent that this is the precise situation about ·which plaintiffs are concerned, namely, the asserted vagueness that a retailer finds in attempting to conform his conduct to this law. As we have construed the Act, it is not only not vague, but it could hardly be clearer.[16] When the offense charged is sale of drug paraphernalia, a retailer is criminally responsible if and only if he *knows, i.e.,* he is practically certain, that the purchaser will use the goods illegally with a controlled dangerous substance, namely, in violation of the Controlled Dangerous Substances Act, *N.J.S.A.* 24:21–1 to –53. In almost every case, the simple question faced by the retailer will be: "Am I practically certain the buyer is

[16]Since we have concluded that our construction of the statute overcomes plaintiff's vagueness challenge, no matter what standard is used in testing that challenge, we need not occupy ourselves with the various settings in which vagueness challenges may be made or the differing standards applied in determining those challenges. For instance, in the First Amendment context, greater exactitude is required. *Smith v. Goguen,* 415 *U.S.* 566, 573, 94 *S.Ct.* 1242, 1247, 39 *L.Ed.*2d 605, 612 (1974). The Act here inhibits no legitimate political or commercial speech interest. It is aimed simply at commercial activity that knowingly encourages criminal conduct. Even if construed as "speech" such conduct is subject to governmental prohibition. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 *U.S.* 557, 563–64, 100 *S.Ct.* 2343, 2350, 65 *L.Ed.*2d 341, 349 (1980); *Pittsburgh Press v. Human Relations Comm'n,* 413 *U.S.* 376, 388, 93 *S.Ct.* 2553, 2560, 37 *L.Ed.*2d 669, 676 (1973). Here we have solely an economic regulation, which calls for a less stringent evaluation. *Hoffman Estates,* 455 *U.S.* at 498, 102 *S.Ct.* at 1193, 71 *L.Ed.*2d at 371; *Papachristou v. City of Jacksonville,* 405 *U.S.* at 162, 92 *S.Ct.* at 843, 31 *L.Ed.*2d at 115–16. The actors "can be expected to consult relevant legislation in advance of action." *Hoffman Estates,* 455 *U.S.* at 498, 102 *S.Ct.* at 1191, 71 *L.Ed.*2d at 371. In this pre-enforcement facial challenge on vagueness grounds, plaintiffs must show the statute is "impermissibly vague in *all* its applications." *Hoffman Estates,* 455 *U.S.* at 495, 102 *S.Ct.* at 1193, 71 *L.Ed.*2d at 369; *United States v. Petrillo,* 332 *U.S.* 1, 6–7, 67 *S.Ct.* 1538, 1541–1542, 91 *L.Ed.* 1877, 1882–83 (1946). We note that in *Hoffman,* the ordinance was sustained against a vagueness attack, the Court noting that it passed muster whether the ordinance was considered either a "quasi-criminal or a criminal law." 455 *U.S.* at 500, 102 *S.Ct.* at 1194, 71 *L.Ed.*2d at 372.

going to use these goods with marijuana or cocaine?" [17] Similarly, when the offense charged is possession of drug paraphernalia, the simple question for the retailer will be whether he possesses the goods, intending to sell them, knowing, *i.e.,* being practically certain, that a buyer of such goods (those adaptable for illegal uses) will use them in that way. A "head shop" owner who sets up his store in an attempt to attract those who illegally use controlled dangerous substances cannot be heard to complain that the law is vague because it is possible that a tobacco smoker may buy one of his pipes, if the fact is that his entire operation makes it practically certain that the buyer will buy the pipe to smoke marijuana. What his complaint amounts to is not that this law will allow an accidental purchase to inculpate him but rather that it will *not* allow an accidental purchase to exculpate him.

Furthermore, "head shop" owners will not succeed in a challenge to this law simply because, on some application, it might be vague when applied to some legitimate shopkeeper. Such facial attacks designed to protect the rights of those not before the court are allowed only in the rarest of circumstances, those involving "weighty countervailing policies," application of which are not at all warranted by the facts of this case. *See United States v. Raines,* 362 *U.S.* 17, 22–23, 80 *S.Ct.* 519, 523–524, 4 *L.Ed.*2d 524, 530–31 (1960).

Our conclusion that this Act is not vague is buttressed considerably by the fact that the main basis for the vagueness contention is the claim that it is difficult to determine from the Act whose intention or knowledge will trigger criminal responsibility, and the companion contention that a retailer cannot be held responsible for someone else's intention. Our construction of the Act eliminates these problems. It is the defendant's intention and knowledge, and only the defendant's, that will trigger

---

[17]By calling the question "simple" we do not exclude expert testimony on these issues.

criminal responsibility under the Act as we have construed it. Thus construed, the Act gives not only fair notice but clear notice. No one can claim that it "punishes, without warning, an offense of which the accused was unaware." *Screws v. United States,* 325 *U.S.* 91, 102, 65 *S.Ct.* 1031, 1036, 89 *L.Ed.* 1495, 1503 (1944). While they are not before us, we note that the other sections of the Act are similarly definite in what constitutes criminal conduct.

Obviously our construction does not mean that the Act may never be vague as applied to a particular defendant, even one who is a retailer. We decide simply what is required in this case, namely, that the Act as construed is more than sufficiently clear to withstand this pre-enforcement constitutional facial challenge. *See Tobacco Accessories v. Treen,* 681 *F.*2d 378, 383 (5th Cir.1982).

For the same reasons we conclude that the Act is sufficiently clear for the guidance of law enforcement officials so as to deter arbitrary and discriminatory enforcement. *Grayned v. City of Rockford, supra,* 408 *U.S.* at 108–09, 92 *S.Ct.* at 2298–99, 33 *L.Ed.*2d at 227–28 (1972); *see Hejira Corp. v. MacFarlane,* 660 *F.*2d 1356, 1367 (10th Cir.1981); *Casbah Inc. v. Thone, supra,* 651 *F.*2d at 558; *Record Revolution No. 6, Inc. v. City of Parma, supra,* 638 *F.*2d at 927; *Geiger v. City of Eagan,* 618 *F.*2d 26, 28 (8th Cir.1980).

Our construction of the Act substantially diminishes the enforcement problems that loomed large to the Court of Appeals in *Parma.* There the court, noting its lack of power to construe the municipal ordinance, 638 *F.*2d at 927, was strongly influenced by the drafters' statements to the effect that the identification of drug paraphernalia was "up to the police" and the evidence on the record that the police themselves could not figure out what "drug paraphernalia" was. *Id.* at 931. This picture of prosecutors, police, and juries making *ad hoc* determinations of what constituted drug paraphernalia led the Court of Appeals to conclude that the ordinance was vague not only

because it did not adequately inform potential defendants of what constituted criminal conduct, but because it had too great a potential for discriminatory enforcement.

Our construction makes it clear that law enforcement personnel should not be preoccupied with the question of whether something, in the abstract, is or is not "drug paraphernalia." As we have construed the statute, anything capable of adaptation for use with controlled dangerous substances is drug paraphernalia. The issue for law enforcement officers is what the owner or operator's intention or knowledge is, to be determined by *all* of the evidence, not simply the nature of the goods, but also the manner in which they are displayed, advertised, and all other circumstances that logically bear on the intention or knowledge of the party who is the potential defendant. The fact that proof of the crime, including proof that defendant knew it was practically certain that his goods would be used with illegal drugs, may be difficult to obtain does not render the ordinance vague. *Record Revolution No. 6, Inc. v. City of Parma,* 492 *F.Supp.* at 1176 n. 12.

Our conclusion is strengthened by the guidelines developed at the suggestion of the Governor and promulgated by the Attorney General. Conditional Veto Message, September 22, 1980. The Attorney General's guidelines, promulgated pursuant to *N.J.S.A.* 52:17B–97 to –117,[18] place severe limits on the ability

---

[18]*N.J.S.A.* 52:17B–98 of the Criminal Justice Act of 1970, *L.* 1970, *c.* 74, declares it to be the responsibility of the Attorney General to do whatever is necessary to "encourage cooperation among law enforcement officers and to provide for the general supervision of criminal justice by the Attorney General as chief law enforcement officer of the State, in order to secure the benefits of a uniform and efficient enforcement of the criminal law and the administration of criminal justice throughout the State."

The promulgation of regulations governing enforcement of New Jersey's Drug Paraphernalia Act falls easily within this statutory mandate.

Such guidelines are useful and will undoubtedly contribute to the efficient and even-handed enforcement of this law. We must point out, however, that administrative regulations alone, no matter how well drafted, can

of individual police or prosecutors to initiate arrests or complaints under the drug paraphernalia statute. For example, the Attorney General himself is the only law enforcement official who may commence a prosecution for advertising violations under Section 4 of the Act. *N.J.S.A.* 24:21–49 (Guideline IC). Only the Attorney General or the county prosecutor may move to enforce *N.J.S.A.* 24:21–48 (retailing) or *N.J.S.A.* 24:21–50 (sale to minors) (Guideline IB). Only in the case of *N.J.S.A.* 24:21–47 (prohibiting unlawful use or possession with intent to use) may a prosecutor or police officer act without prior approval from his superiors (Guideline IA).

The guidelines also forbid the commencement of any action under *N.J.S.A.* 24:21–47 unless the alleged paraphernalia is found in close proximity to a controlled dangerous substance or residue of a controlled dangerous substance (Guideline IIA). No actions are to be brought under *N.J.S.A.* 24:21–48 or 24:21–50 unless there has been a determination by the Director of Criminal Justice or a county prosecutor that a reasonable likelihood of conviction exists (Guideline IIB).

Finally, the search and seizure powers of law enforcement officials are narrowly drawn, including a requirement that a warrant be obtained in all circumstances from a County District or Superior Court judge (Guideline IIB).

It is our conclusion that these general guidelines representing the State's commitment to fair, even-handed law enforcement, coupled with the basic soundness of the Act itself, serve to

---

never rehabilitate a statute that is unconstitutionally vague. If a law provides no standard of guilt, permitting the Attorney General to provide one would allow the Attorney General to make the law rather than enforce it—precisely the situation decried in *Grayned v. City of Rockford, supra,* and other Supreme Court precedents.

The Attorney General's guidelines should be considered in conjunction with *N.J.S.A.* 24:21–46, but we must stress that it is the fundamental soundness of the law itself, not these guidelines, that leads us to our result in this case.

defeat plaintiffs' claim that this law poses a substantial danger of arbitrary or discriminatory enforcement.

Admittedly, there may in fact be a future instance in which the decision to prosecute is ill-advised, unfair, or even discriminatory. Yet this is neither more nor less than the risk of unfairness inherent in many criminal statutes. That there may be a borderline area where application of the law is vague does not render the entire statute void for vagueness unless that borderline area is so broad that it covers practically the entire statute. As the Supreme Court said in *United States v. Petrillo*, 332 *U.S.* 1, 67 *S.Ct.* 1538, 91 *L.Ed.* 1877 (1947):

> That there may be marginal cases in which it is difficult to define the side of the line on which a particular fact situation falls is not sufficient reason to hold the language too vague to define a criminal offense .... [T]he Constitution does not require impossible standards. [*Id.* at 7, 67 S.Ct. at 1542].

### V.

Plaintiffs argue that *N.J.S.A.* 24:21–49, which makes it a crime to place a printed advertisement "knowing that the purpose of the advertisement in whole or in part, is to promote the sale of objects intended for use as drug paraphernalia," infringes on their First Amendment right to engage in commercial speech. Plaintiffs also contend that the statute is overbroad because it inhibits free speech rights of other parties.[19]

Although *N.J.S.A.* 24:21–49 inhibits commercial speech by making it a crime to place advertisements that promote the sale of drug paraphernalia, the advertising provi-

---

[19]Plaintiffs further claim that the advertising provision is unconstitutionally vague. They contend that *N.J.S.A.* 24:21–49 fails to indicate whose intent for use (the advertiser's, customer's, or someone else's) determines whether an advertisement is criminal, thereby forcing them to guess about the legality of their advertisements. We see no problem of vagueness. As noted *supra* at 104–106, the Drug Paraphernalia Act's legislative history clearly indicates that the relevant intent is always that of the defendant. Accordingly, the advertiser's intent is critical to a prosecution under *N.J.S.A.* 24:21–49.

sion does not violate plaintiffs' First Amendment rights.[20] The constitutional protection accorded to commercial speech "is less than is provided to other constitutionally guaranteed expression." *State v. Miller,* 83 *N.J.* 402, 412 n. 5 (1980), citing *Central Hudson Gas & Elec. Co. v. Public Serv. Comm'n,* 447 *U.S.* 557, 100 *S.Ct.* 2343, 65 *L.Ed.2d* 341 (1980). Although the First Amendment protects commercial speech from unwarranted governmental regulation, *Central Hudson,* 447 *U.S.* at 563–64, 100 *S.Ct.* at 2350, 65 *L.Ed.2d* at 348; *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council,* 425 *U.S.* 748, 762, 96 *S.Ct.* 1817, 1825, 48 *L.Ed.2d* 346 (1976), plaintiffs' commercial speech may be regulated or banned, as it is here, if it proposes an illegal transaction. *Hoffman Estates,* 455 *U.S.* at 496, 102 *S.Ct.* at 1192, 71 *L.Ed.2d* at 370; *Central Hudson, supra; Pittsburgh Press Co. v. Human Relations Comm'n,* 413 *U.S.* 376, 388, 93 *S.Ct.* 2553, 2560, 37 *L.Ed.2d* 669 (1973).

Plaintiffs' overbreadth challenge must also be rejected.[21] The overbreadth doctrine strives to protect parties who

---

[20] It is important to note that we are not dealing with a restriction on "pure," non-commercial speech. Under the advertising provision at hand, only printed advertisements promoting the sale of items for use as paraphernalia are prohibited. "Printed matter criticizing the drug laws, glorifying the drug culture, glamorizing the use of drugs, or providing information or instruction on illicit drug [sic] is not affected." Sponsor's Statement to S. 1021 (1980).

[21] Overbreadth contentions differ analytically from vagueness claims. The vagueness concept, as noted earlier, rests on principles of procedural due process; it demands that a law be sufficiently clear and precise so that people are given fair notice and adequate warning of the law's reach. The overbreadth concept, on the other hand, rests on principles of substantive due process; the question is not whether the law's meaning is sufficiently clear, but whether the reach of the law extends too far. The evil of an overbroad law is that in proscribing constitutionally protected activity, it may reach farther than is permitted or necessary to fulfill the state's interests. *In re Hinds,* 90 *N.J.* 604, 617–18 (1982); *State v. Lashinsky,* 81 *N.J.* 1, 15–18 (1979); *Landry v. Daley,* 280 *F.Supp.* 938, 951–52 (N.D.Ill.), app. dism., 393 *U.S.* 220, 89 *S.Ct.* 455, 21 *L.Ed.2d* 392 (1968), rev'd on other grounds sub nom. *Boyle v. Landry,* 401 *U.S.* 77, 91 *S.Ct.* 758, 27 *L.Ed.2d* 696 (1971).

are unlikely to seek judicial review of laws that unconstitutionally infringe on their freedom of expression. *Central Hudson,* 447 *U.S.* at 565 n. 8, 100 *S.Ct.* at 2351 n. 8, 65 *L.Ed.*2d at 350, citing *Broadrick v. Oklahoma,* 413 *U.S.* 601, 612–13, 93 *S.Ct.* 2908, 2915–16, 37 *L.Ed.*2d 830 (1973). The Supreme Court has noted, however, that those affected are apt to challenge overbroad laws that affect their commercial well-being—*i.e.,* they do not need help from others. *Central Hudson,* 447 *U.S.* at 565 n. 8, 100 *S.Ct.* at 2351, 65 *L.Ed.*2d at 350. Therefore, the overbreadth doctrine does not apply to commercial speech, *Hoffman Estates,* 455 *U.S.* at 496–97, 102 *S.Ct.* at 1192–93, 71 *L.Ed.*2d at 370, citing *Central Hudson,* 447 *U.S.* at 565 n. 8, 100 *S.Ct.* at 2351 n. 8, 65 *L.Ed.*2d at 350, and plaintiffs may not assert the commercial speech rights of other persons.

## *Conclusion*

The Supreme Court's decision in *Hoffman Estates,* sustaining a municipal ordinance against a pre-enforcement vagueness attack, strongly supports our decision today. While that ordinance was a licensing ordinance, the Supreme Court viewed it as subject to the same standard of review as a criminal statute. The conduct criminalized there, the sale of goods "designed or marketed for use" with illegal drugs, is much broader than that covered by New Jersey's Act, the violators of that ordinance therefore undoubtedly comprise a much larger class, and proof of the offense itself is a much lesser burden. Furthermore, that Court's later reversal of the Court of Appeals in *Parma,* remanding the case to the Sixth Circuit for further consideration in the light of *Hoffman Estates,* contains an unmistakable message when read with *Hoffman Estates'* references to the Court of Appeals' opinion in *Parma* (dealing, as here, with a law substantially the same as the Model Act):

> The hostility of some lower courts to drug paraphernalia laws—and particularly to those regulating the sale of items that have many innocent uses, *see, e.g.,* 639 *F.*2d 373, 381–83 (1981); *Record Revolution No. 6 Inc. v. City of Parma,* 638 *F.*2d 916, 920 (6th Cir.1980), vacated and remanded, 451 *U.S.* 1013, 101 *S.Ct.* 2998, 69 *L.Ed.*2d 384 (1981)—may reflect a belief that these measures are ineffective in

stemming illegal drug use. This perceived defect, however, is not a defect of clarity. In the unlikely event that a state court construed this ordinance as prohibiting the sale of all pipes, of whatever description, then a seller of corncob pipes could not complain that the law is unduly vague. He could, of course, object that the law was not intended to cover such items. [*Hoffman Estates,* 455 *U.S.* at 497 n. 9, 102 *S.Ct.* at 1192–93 n. 9, 71 *L.Ed.*2d at 371 n. 9].

Whatever the cause of the hostility, there is no room for it given the Legislature's evaluation of the scope of the drug problem. Using the approach of the United States Supreme Court in *Hoffman Estates,* there is nothing vague about our Act, which is patterned after the Model Drug Paraphernalia Law. The Act is constitutional and the operation of "head shops," as the term is generally understood, is criminal. Our laws, and those who enforce them, are at least as capable as the ordinary citizen of distinguishing an illegal "head shop" from a legitimate supermarket or variety store, and, thereafter, quite capable of imposing the appropriate criminal or civil remedy, be it a fine, imprisonment, seizure or closing down.[22]

Affirmed.

*For Affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and GARIBALDI—6.

*For reversal*—None.

---

[22]We wish to note that operation of a "head shop" may subject any drug paraphernalia to seizure by the state as contraband in accordance with New Jersey's civil forfeiture provision. *N.J.S.A.* 2C:64–1 to –9; *see also Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 *U.S.* 663, 94 *S.Ct.* 2080, 40 *L.Ed.*2d 452 (1979).

We also note that the operator of a place of business who knowingly engages in the sale of drug paraphernalia may be liable for maintaining a nuisance in violation of *N.J.S.A.* 2C:33–12. Upon the operator's conviction under this statute, the property used to maintain the nuisance may be seized and any buildings used in the operation closed for up to one year. *N.J.S.A.* 2C:33–12.1.