JAMES S. BARRY, JR., DIRECTOR OF CONSUMER AFFAIRS, RESPONDENT, v. ARROW PONTIAC, INC., A CORPORATION ORGANIZED UNDER THE LAWS OF THE STATE OF NEW JERSEY, APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued May 24, 1983—Decided February 9, 1984.

614

Before Judges BOTTER, POLOW and BRODY.

*Eric L. Chase* argued the cause for appellant (*Martin G. Margolis*, attorney; *Eric L. Chase* on the brief).

*Alan S. Pralgever*, Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney; *James J. Ciancia*, Assistant Attorney General, of counsel; *Alan S. Pralgever* on the brief).

The majority opinion of the court was delivered by

BRODY, J.A.D.

Adopting the findings and conclusions of an administrative law judge, respondent Director of the Division of Consumer Affairs (Division) adjudged appellant, a new car dealer, guilty of distributing in the mail an advertisement which violates *N.J.A.C.* 13:45A–2.2(a)(7)(iv). The advertisement states that many of its cars are "priced well below dealer invoice." The regulation prohibits "[t]he use in any advertisement of a comparison to the dealer's cost or inventory price." Appellant was ordered to cease and desist the practice and pay a penalty of $1,600 and costs. It contends that the regulation falls outside the purposes and policies of the Consumer Fraud Act (the act) (*N.J.S.A.* 56:8–1 *et seq.*) under which it was promulgated, unconstitutionally abridges the right of free speech, and either does not apply to appellant's ad or, if it does, is unconstitutionally vague and overbroad. We disagree and affirm.

Appellant's arguments rest on its assertion, which we reject, that the ad is not deceptive and misleading but rather informs the public of a fact helpful in deciding on the purchase of a new car.

Because of product standardization, price is a major competitive factor in the sale of new cars. An advertisement is particularly luring if it persuades the potential buyer that the advertiser's prices are lower than its competitor's. Because it is difficult if not impossible for an advertiser to compare each of its prices with those of its competitors, competitive price advertising tends to take a different form. The advertiser tries to persuade the reader that its price compares favorably to a fixed and generally understood point of comparison such as the manufacturer's suggested retail price.

Acting under the rule-making authority of *N.J.S.A.* 56:8–4, the Attorney General promulgated regulations regarding comparison price advertising intended to assure the integrity of the point of comparison and a full disclosure of the components of the advertised price with which it is being compared. A dealer

may advertise that its sales price is a reduction from the manufacturer's suggested retail price so long as the sales price includes the same costs, such as dealer preparation and freight charges, as the suggested retail price and the manufacturer's suggested retail price is "clearly denominated as such." *N.J. A.C.* 13:45A–2.2(a)(2)(iii) and (v). A dealer may advertise that his sales price is a reduction from his usual sales price so long as he can prove by his records at least three occasions during the previous 90-day period when "the advertised motor vehicle or its substantial equivalent" was "sold or offered for sale" at that "usual" price. The reduction must be at least 5% of his "usual retail sale price." *N.J.A.C.* 13:45A–2.2(a)(4)(i). A dealer may advertise that his sales prices are lower than those of his competitors so long as his prices are in fact "reasonably below those usually offered in the business area of the advertiser." *N.J.A.C.* 13:45A–2.2(a)(7)(iii).

The regulation in question expressly prohibits "any advertisement of a comparison to the dealer's cost or inventory price." The regulation is reasonable because a dealer's cost or what he pays to put or keep a vehicle in inventory is not a fixed, uniform and generally understood point from which meaningful comparisons can be made. When a dealer advertises that he is selling a car for what it cost, a reader can easily be misled into believing that if he purchased the car he would be getting a bargain not realizing that the advertiser's idea of cost may include a portion of overhead and payments to the manufacturer which will later be refunded. Appellant's general manager conceded the point. He testified, "Very often it is almost impossible to tell what your true cost of a car will be because of many factors."

Appellant's precise point is that "dealer invoice," the point of comparison used in its ad, is a specific, identifiable dollar amount and therefore may be fairly used. According to its general manager, the invoice price is "an amount of money which the dealer pays for the automobile to the factory. And

that is it." By way of example, appellant put into evidence a typical invoice showing "invoice total" to be $5,566.81. According to its manager, that is the "dealer invoice" price. However, the invoice itself shows that the figure includes a "holdback" of $178.89, "adv. assn." of $100 and "SFPIPP" of $25—all of which the factory will return to the appellant. Nevertheless, appellant insists that it should be free to advertise in effect that $5,566.81 is what it paid the factory for the car. It may be, as the manager testified, that if a customer asked to see the invoice these reductions of the invoice price would be explained. However, we are dealing here with whether the ad is misleading, not with whether its misleading features will later be explained to a customer who is sophisticated enough to ask to see the invoice.[1]

In addition to the rebates appearing on the invoice, there was unrefuted evidence that some dealers may expect other payments from the factory in the form of sales bonuses and subsidies to meet various adverse market conditions. One may well argue that some or all of these payments reduce what "the dealer pays for the automobile to the factory." We are satisfied that like "cost" and "inventory price," "dealer invoice" is not a fixed, uniform term generally understood by the public to mean what the advertiser may intend it to mean.

---

[1] On cross-examination, appellant's manager admitted that even if the customer were shown the invoice, he would not be told that appellant would recoup the holdback:

Q ... And do you think if an ordinary person looked at a document of this sort, that that person would understand that you might recoup the holdback from the invoice total?
A It is possible.
Q Do you think it is more—
A I don't know.
Q Possible than not? .
A I don't know.
Q Let me ask you this question. Would a consumer be told that you would recoup a portion of that holdback from the invoice total?
A I would say no.

Quite apart from our own view of the matter, we must defer to the expertise of the Division which has reasonably concluded that cost-price advertising in general is inherently deceptive and that appellant's ad is such a prohibited practice. *See Gloucester Cty. Welfare Bd. v. N.J. Civ. Serv. Comm'n.,* 93 *N.J.* 384, 389–391 (1983); *Fenwick v. Kay American Jeep, Inc.,* 72 *N.J.* 372 (1977). A car buyer could easily be misled by an ad featuring cost-price comparisons into believing that the stated cost is what the dealer paid for the car. The same danger exists when the dealer expresses cost as "dealer invoice." The regulation as interpreted and applied here is consistent with and advances the act's purpose to declare unlawful an advertising practice which misrepresents "any material fact ... whether or not any person has in fact been misled, deceived or damaged thereby...." *N.J.S.A.* 56:8–2.

The constitutional right of commercial speech does not include the right to mislead the public. *Central Hudson Gas v. Public Serv. Comm'n.,* 447 *U.S.* 557, 566, 100 *S.Ct.* 2343, 2351, 65 *L.Ed.*2d 341, 351 (1980); *In re Professional Ethics Advisory Comm. Op. 475,* 89 *N.J.* 74, 83 (1982), app. dism. 459 *U.S.* 962, 103 *S.Ct.* 285, 74 *L.Ed.*2d 272 (1982). It should also be noted that commercial speech is accorded less constitutional protection than "pure" noncommercial speech. *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 124–125 (1983).

The regulation is not rendered unconstitutionally vague by including "dealer invoice [price]" within the meaning of "dealer's cost or inventory price." Those against whom the regulation operates and those who enforce it cannot mistake its prohibitory scope. *See Grayned v. City of Rockford,* 408 *U.S.* 104, 108–109, 92 *S.Ct.* 2294, 2298–2299, 33 *L.Ed.*2d 222, 227–228 (1972). Whether a regulation is unconstitutionally vague must be analyzed from the point of view of those to whom it applies, taking into account their "peculiar expertise in being able to assess the meanings of [its] terms." *In re Polk License Revocation,* 90 *N.J.* 550, 575 (1982).

 A law may be unconstitutionally overbroad if in "proscribing constitutionally protected activity, it ... reach[es] farther than is permitted or necessary to fulfill the state's interests." *Town Tobacconist v. Kimmelman, supra*, 94 *N.J.* at 125, n. 21. We have held that the regulation is reasonable and not vague as applied to appellant. The overbroad objection may be raised only to protect the rights of others. Because "those affected are apt to challenge overbroad laws that affect their commercial well-being, ... the overbreadth doctrine does not apply to commercial speech...." *Id.* at 126.

Affirmed.

BOTTER, P.J.A.D. (dissenting).

By preventing advertising in relation to the dealer's invoice price, a portion of the regulation in question tends to reduce a legitimate mode of competition through advertising and deprives the public of information that would be useful in shopping for a new automobile. In the name of preventing deception and misleading advertising, the regulation goes beyond the means necessary to achieve a lawful, regulatory purpose, and it unduly restricts commercial speech. For these reasons, part of the regulation is unreasonable in my opinion, and I respectfully dissent.

The consumer fraud law, *N.J.S.A.* 56:8–1 *et seq., L.*1960, *c.* 39, makes it unlawful to use fraud, deception or misrepresentation in connection with the sale and advertisement of any merchandise. *N.J.S.A.* 56:8–2. Regulations may be adopted to further the purposes of the law. *N.J.S.A.* 56:8–4. Pursuant thereto, *N.J.A.C.* 13:45A–2.1 *et seq.* were adopted to regulate motor vehicle advertising practices. The regulations contain many valid provisions.[1] The regulation involved in this case, *N.J.A.C.* 13:45A–2.2(a)(7)(iv), prohibits:

---

[1]For example, the regulations provide that when a new or used motor vehicle is advertised for sale, as distinguished from advertising "the general

The use in any advertisement of a comparison to the dealer's cost or inventory price.

As interpreted by the Division and upheld by my colleagues, new car dealers cannot advertise and offer to sell motor vehicles in New Jersey at or below "dealer invoice" price or at a given sum, such as $100 or $200, above "dealer invoice" price.

The regulation clearly prohibits advertising in relation to "dealer's cost." One obvious reason for this regulation is that the "cost" to a dealer is a variable term that is difficult to define and may mean different things to many people. If a dealer could advertise motor vehicles for sale at "cost," members of the public may be misled into thinking the advertisement refers to the price a dealer has paid the manufacturer. Instead, the dealer could be referring to all costs, including the cost charged by the manufacturer as well as salesmen's commissions and various overhead or operating costs that are difficult to ascertain. Because such advertising could be misleading, I would uphold the regulation to the extent that it bars advertising in relation to the ephemeral term "dealer's cost."

A different problem is posed by the use of the term "inventory price." It is not clear what is meant by this term. In the case at hand answers to interrogatories supplied by respondent stated that, as used in *N.J.A.C.* 13:45A–2.2(a)(7)(iv):

"Dealers [*sic*] cost" and "inventory price" are construed to mean the price the dealer pays the manufacturer for an automobile. Such "cost" or "price" includes, but is not limited to, the following factors:

a) overhead costs;

b) rebates or other cash returns from the manufacturer;

c) dealer holdbacks;

d) commissions from credit sales;

---

availability or qualities" of a make, model or series of new motor vehicles, the "specific dollar amount indicating the total retail selling price," exclusive of taxes and licensing costs, must be stated. *N.J.A.C.* 13:45A–2.2(a)(2)(ii). The foreword to the regulations states that this provision was adopted to require a statement of the "bottom line" price and to prevent advertising that does not represent the actual sales price inclusive of dealer preparation and freight charges.

e) discounts;

f) freight charges;

g) floor plan charges;

h) markup for profit; ·

i) allowance from the manufacturer for volume sales;

j) advertising costs;

k) incentive awards;

l) bonuses.

This answer indicates that "dealer's cost" and "inventory price" were intended to mean the same thing. . This suggests respondent's lack of expertise and probably also the failure to comprehend what the regulation's author had in mind. The term "inventory price" does not appear to be in common usage in the trade. Thus, the initial draftsman may also have lacked expertise. The problem posed by the vague term "inventory price" was perceived by the New Jersey Automobile Dealers' Association. Its representatives asked the Division of Consumer Affairs (Division) in September 1981 if the term "factory invoice" could be inserted in the regulation dealing with comparisons to dealer's cost or inventory price.[2] Although considered, the suggestion has not been adopted. Nevertheless, in another interrogatory answer in this case, respondent stated that "dealer invoice" is considered synonymous with the terms "dealer cost" and "inventory price" as used in *N.J.A.C.* 13:45A–2.-2(a)(7)(iv). Of course, the term "dealer invoice" is not used in the regulation. Nor is it likely that the term "dealer invoice" would connote a list of costs that include "markup for profit,"[3] "overhead costs," and "bonuses" which were listed by respondent in the answer mentioned above as items included in "dealer's cost" and "inventory price."

---

[2]This dialogue was disclosed in answer to an interrogatory supplied by respondent in the case at hand.

[3]This item must be a mistake on the part of the person who prepared the interrogatory answer. It is inconceivable that the terms "dealer cost" and "inventory price" could include a markup for profit.

With this background the case before us can be considered. In November 1980, appellant ran an advertisement which read in pertinent part:

You will be able to take your brand new Pontiac home with you TONIGHT!

NOTE * * *

Our sales managers will not authorize these Special Prices on any car not in stock (Many will actually be PRICED WELL BELOW DEALER INVOICE.) [Emphasis in original.]

In response to this advertisement the Director of the Division of Consumer Affairs filed a complaint charging that appellant had violated *N.J.A.C.* 13:45A–2.2(a)(7)(iv).

At the hearing before an administrative law judge appellant contended that advertising in reference to the dealer's invoice price did not violate the regulation because the term was not synonomous with dealer's cost or inventory price. Appellant also contended that, if interpreted to preclude reference to the dealer's invoice price, the regulation unduly interfered with commercial speech and was overbroad. These contentions were rejected by the administrative law judge and his findings and conclusions were adopted in their entirety by respondent. A fine was imposed, and respondent was ordered to cease and desist such advertisements.

At the hearing the witness who testified in support of the complaint was Richard DeLorenzi, a former supervisor of the section which enforced the automotive advertising regulations. He testified that the regulation bars advertising which refers to the dealer's cost or invoice. Asked what the terms "dealer's cost or inventory price" mean to him, he replied:

This is very difficult to say because there are a couple of frames of references on that matter.

Dealer's cost as most dealers use it as I have found out in my experience is they mean the cost that they got on the original invoice from the manufacturer. But that is not the final cost to the dealer for that particular vehicle.

There are such things as holdbacks which the manufacturer after the dealer pays for the cost of the vehicle on the invoice, the manufacturer sets aside a certain amount of money and then returns it to the dealer and the dealer gains anywhere from two to three percent of the value that was on the original

invoice. So the invoice and the costs that they refer to on their advertisements is [*sic*] not a true cost.4

DeLorenzi testified also that the terms "dealer's cost" and "inventory price" meant the invoice or bill received by a dealer from the manufacturer. He conceded that it differed from the description given in the answer to interrogatories because the invoice did not contain items showing overhead costs and mark-up for profit as well as other items indicated in that answer. He also conceded that the terms "dealer's cost" and "inventory price" include certain items that do not appear on the dealer's invoice.

The testimony in the case from Division's witness and appellant's witness establishes that "dealer invoice" is a commonly used term which refers to a document showing what the manufacturer has billed the dealer for a particular car.5 The term may be contrasted with the terms used in the regulation, "dealer's cost" or "inventory price," which have no fixed, generally accepted meaning in the trade. Whether respondent and its agents meant to equate dealer's cost and dealer invoice is immaterial; they did not expressly do so in the regulation, and the terms used in the regulation do not include a term of art in the trade, namely, dealer invoice. Thus, appellant should not have been found guilty of violating the regulation, whether or not it is lawful.

---

4In response to appellant's earlier motion to dismiss Division's complaint, Division's Executive Director filed an affidavit saying that since the regulation was enacted in 1976 it has been interpreted to preclude use of any comparison between a selling price and dealer's cost, inventory price or "term of similar import or meaning" used to refer to "the price which the dealer actually paid the manufacturer in the purchase of the car." DeLorenzi's testimony suggested that the regulation was interpreted to bar advertising in relation to the dealer's invoice price.

5See also "How to Deal with the Dealer," 48 *Consumer Reports* No. 4 (April 1983) at 167, which refers to the "invoice price" of a car as "the price the factory charged the dealer...." See also "invoice price" used in *Kapiolani Motors Ltd. v. General Motors Corp.*, 337 *F.Supp.* 102, 104 (D.Haw.1972).

However, if the regulation is deemed to include a prohibition of advertising in relation to the dealer's invoice price, I would hold it invalid to that extent.

The record before us contains a sample invoice from the Pontiac Motor Division of General Motors Corporation to appellant. It refers to a specific automobile. It shows the suggested retail price for the basic car, the optional items included, and the suggested retail price of the options. The total of these costs plus delivery and freight charges are shown as the manufacturer's suggested retail price. The invoice also shows a lower sum designated "invoice total." This is the dealer invoice price.[6] Appellant's witness testified that this is "the amount of money that is paid by the dealership to General Motors for the vehicle." The invoice also shows a lower figure representing the "invoice total" less amounts deducted for "hold back," "SFPIPP" (Supplemental Floor Plan Interest Protection Program), and "Adv.Assn." (advertising fees). The evidence shows that the hold back sum ($178.89 on a vehicle that carried a manufacturer's suggested retail price of $6,170.85) is regularly returned to the dealer by the manufacturer, and that other designated items which are included in the dealer's invoice price are also recouped by the dealer from the manufacturer. Indeed, the invoice itself bears the legend:

INVOICE MAY NOT REFLECT THE ULTIMATE COST OF THE VEHICLE IN VIEW OF THE POSSIBILITY OF FUTURE REBATES, ALLOWANCES, DISCOUNTS AND INCENTIVE AWARDS FROM MANUFACTURER TO DEALER.

Appellant's expert testified that appellant would show a customer the invoice upon request if appellant advertised on the basis of dealer invoice.

As interpreted in the majority opinion, the regulations allow advertising that shows discounts from the manufacturer's suggested retail price (see N.J.A.C. 13:45A–2.2(a)(2)(v)), but do not

---

[6]Listed alongside the "suggested retail price" of the option items is the lower "invoice amount" for each option.

allow advertising that would, for example, offer a given price above the dealer's invoice price. The reason given is that an unsophisticated buyer may take the "dealer invoice" price to suggest the actual cost to the dealer, without realizing that the actual cost is reduced by holdbacks and other charges that the dealer recoups from the manufacturer as well as by other sums that may reward the dealer for high sales volume.

There are several answers to these concerns. In the first place, the means used by the regulation—a total ban on advertising in relation to the dealer's invoice price—is excessive. It applies a remedy that is worse than the disease. If car buyers do not know that the dealer invoice price does not show the actual cost to the dealer, the regulations could simply require advertisements to announce that fact. It is advantageous for buyers to know *at least* the amount of the dealer's invoice price. If the fear is that they will not avail themselves of information in the public domain, namely, that dealer invoice price does not mean actual cost, a simple remedy can be supplied by tailoring the regulation to meet this need. It is worth repeating that the invoice in evidence contains this notice to prospective buyers. The invoice also shows the "memo amount less H/B & Adv." as $5,262.92 in addition to the "Invoice Total" of $5,566.81. Thus, a buyer who examines the invoice—the regulation can also require that the invoice be given to the buyer when dealer-invoice advertising is employed—would be able to compare the initial invoice price with the net invoice charge to the dealer. Whether contained on the invoice or not, the regulation can require that buyers be advised of holdbacks, rebates and other discounts from dealer invoice price. After all, buyers normally do not expect dealers to sell cars at cost. Everyone knows that a retail seller must have a markup over cost to stay in business. The idea that this regulation is needed to protect the public is fanciful. The record before us does not justify giving uncritical deference to the supposed expertise of Division on this subject.

It is axiomatic that regulations must not only serve a legitimate governmental purpose, but the means chosen must be reasonable and appropriate to that end and "in keeping with the public need." *Roselle v. Wright,* 21 *N.J.* 400, 410 (1956); *see Collingswood v. Ringgold,* 66 *N.J.* 350, 359 (1975), App. dism. 426 *U.S.* 901, 96 *S.Ct.* 2220, 48 *L.Ed.*2d 826 (1976). The regulation may not be entirely arbitrary and capricious, but "an exercise of power that exceeds the bounds of reasonable necessity would run afoul" of common rights. *Reingold v. Harper,* 6 *N.J.* 182, 191 (1951). The state may regulate commercial speech to prevent misleading the public. But speech is not entirely "unprotected merely because ... it serves the economic purposes of [a] corporate entity." *Collingswood v. Ringgold, supra,* 66 *N.J.* at 363. Advertising in relation to dealer invoice price is not inherently misleading; it is not a misrepresentation; it is not deceptive or false. What is feared is that portions of the public may not know enough. The problem is not that the advertising tells too much about dealer invoice price but that it may not tell enough. If this is so, the remedy ought to require more disclosure rather than the suppression of all advertising on the subject.

In *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of N.Y.,* 447 *U.S.* 557, 100 *S.Ct.* 2343, 65 *L.Ed.*2d 341 (1980), the United States Supreme Court invalidated a regulation of the New York Public Service Commission that banned advertising which promoted the use of electricity. The ban was adopted to serve the state's interest in conserving energy and insuring fair rates for electricity. The court held that the regulation violated the rights of free speech protected by the First Amendment. Commercial speech, the court said, is protected against "unwarranted governmental regulation"; it not only serves the economic interest of the speaker, but "also assists consumers and furthers the societal interest in the fullest possible dissemination of information." 447 *U.S.* at 561–562, 100 *S.Ct.* at 2349, 65 *L.Ed.*2d at 348. The court espoused enlarging communication, not contracting it. "Even

when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all" (citing *Bates v. State Bar of Arizona*, 433 *U.S.* 350, 97 *S.Ct.* 2691, 53 *L.Ed.*2d 810 (1977)). 447 *U.S.* at 562, 100 *S.Ct.* at 2349, 65 *L.Ed.*2d at 348. The court said that permissible regulation of commercial speech must be "in proportion to" the regulatory interest and "must be designed carefully to achieve the State's goal." Thus, the First Amendment requires that speech restrictions be "narrowly drawn"; "if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." 447 *U.S.* at 564, 100 *S.Ct.* at 2350, 65 *L.Ed.*2d at 350.

In holding the ban invalid, the court in the *Central Hudson* case noted that the advertising was neither inaccurate nor unlawful. The court also said that the commission did not demonstrate that the public purpose it sought to advance "cannot be protected adequately by more limited regulation of [the] commercial expression." 447 *U.S.* at 570, 100 *S.Ct.* at 2354, 65 *L.Ed.*2d at 354. As noted in *Bates v. State Bar of Arizona*, 433 *U.S.* at 374–375, 97 *S.Ct.* at 2704, 53 *L.Ed.*2d at 830, in connection with advertising by attorneys, omissions that tend to give an inaccurate impression should be cured by affording greater disclosure rather than a complete ban. As the Supreme Court said in *Bates*, it is strange to deny the dissemination of relevant information to the consumer on the ground that it is incomplete; for

... the argument assumes that the public is not sophisticated enough to realize the limitations of advertising, and that the public is better kept in ignorance than trusted with correct but incomplete information. We suspect the argument rests on an underestimation of the public. In any event, we view as dubious any justification that is based on the benefits of public ignorance. [*Ibid.*]

For the stated reasons I would hold the regulation invalid. It suppresses useful information; the means chosen to avoid misconceptions unduly encroaches on rights of free speech; and the remedy for the perceived danger of deception is to require

more disclosure rather than the suppression of relevant information. The regulation stifles a legitimate, honest means of competition and deprives the public of the benefit of truthful advertising. Therefore, I dissent from my colleagues' decision.