JAMES S. BARRY, JR., DIRECTOR OF CONSUMER AFFAIRS, RE-SPONDENT, v. ARROW PONTIAC, INC., A CORPORATION ORGANIZED UNDER THE LAWS OF THE STATE OF NEW JERSEY, APPELLANT.

Argued January 22, 1985—Decided July 18, 1985.

*Eric L. Chase* argued the cause for appellant (*Margolis, Chase, Kosicki, Aboyoun & Hartman,* attorneys; *Eric L. Chase* and *Genevieve K. LaRobardier,* on the briefs).

*Alan S. Pralgever,* Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns alleged violations by Arrow Pontiac, Inc. (Arrow) of the Consumer Fraud Act, *N.J.S.A.* 56:8–1 through –38, and in particular the implementing regulation, *N.J.A.C.* 13:45A–2.2(a)7iv, which makes unlawful

[t]he use in any advertisement of a comparison to the dealer's cost or inventory price.

The critical issue here is whether there is sufficient credible evidence for the Division of Consumer Affairs (Division) to find that Arrow's advertisement was misleading and deceptive to the consuming public. Two attendant questions are whether the advertisement is within the scope and intendment of the

regulation, and if so, whether the regulation unconstitutionally infringes on Arrow's First Amendment right to engage in commercial speech. Arrow also argues that the regulation is unconstitutionally vague and overbroad.

In November of 1980, Arrow, an automobile dealer that sells and services new Pontiac automobiles, mailed to certain of its New Jersey customers a letter "inviting" them to take advantage of "once-in-a-lifetime prices." Near the bottom of the letter was the following language:

> You will be able to take your brand new Pontiac home with you TONIGHT! NOTE:
>
> Our sales managers will not authorize these Special Prices on any car not in stock (Many will actually be PRICED WELL BELOW DEALER INVOICE) (Emphasis in original).

In August of 1981, the Director of the Division of Consumer Affairs (Director) filed a complaint against Arrow claiming it had violated *N.J.A.C.* 13:45A–2.2(a)7iv.

> For "many" motor vehicles respondent used a comparison to the dealer's cost or inventory price.

The Director sought an order that Arrow cease and desist the practice and pay a penalty of $1,600 and costs.[1] Arrow filed a motion to dismiss the complaint or, in the alternative, for summary judgment. In support of this motion, Arrow contended that the language of the advertisement violated neither the wording of the regulation nor the purpose and policy behind it. The Administrative Law Judge denied Arrow's motion.

Arrow then requested reconsideration of its motion, contending for the first time that the regulation is unconstitutional because it violates Arrow's First Amendment right to engage in commercial speech, and that it is vague and overbroad. Reconsideration was denied and a hearing was held.

---

[1] Arrow has violated motor vehicle advertising regulations on three prior occasions. Penalties for violating the automobile advertising regulations increase with the number of infractions. A fourth violation carries a $1,600 penalty.

After the hearing the Administrative Law Judge issued an "Initial Decision," holding in favor of the Division. The Director adopted the findings and conclusions of the Administrative Law Judge. Arrow filed an appeal of the Director's Order with the Appellate Division. The Appellate Division, 193 *N.J. Super.* 613, Judge Botter dissenting, affirmed the Director's Order. Arrow appeals as of right to this Court pursuant to Rule 2:2–1(a)(2). We affirm the judgment of the Appellate Division.

I

The initial inquiry here is whether the term "dealer invoice" used in the advertisement violates either the language or the spirit of *N.J.A.C.* 13:45A–2.2(a)7iv. Arrow asserts that the term "dealer invoice" is not synonymous with the terms "dealer's cost" or "inventory price," which are used in the regulation. Moreover, it argues that the term "dealer invoice," the point of comparison used in its ad, is a specific, identifiable dollar amount and therefore its use does not mislead the public. Consequently, Arrow reasons, its advertisement does not violate the language or the spirit of the regulation.

The Division disagrees, arguing that the terms "dealer's cost" and "inventory price" are meant to act as "guidelines to indicate those areas of comparison pricing which are to be outlawed," and that the term "dealer invoice" is synonymous with those terms. It alleges that the language in Arrow's advertisement was designed to circumvent the literal language of the regulation and as such does "not comport with [the] spirit or letter of the law." Further, the Division alleges the term "dealer invoice," like "dealer's cost" or "inventory price," is not a fixed uniform term, and its use, therefore, is as likely to mislead a consumer as is the use of the latter terms.

Both the Administrative Law Judge and the Appellate Division agreed with the Division. The Appellate Division, deferring to the expertise of the Division, held that the term "dealer

invoice" is not a fixed, uniform term, and that it is this difficulty in ascertaining the true cost of an automobile to the dealer that renders the comparison to a dealer's invoice price as potentially deceptive and misleading to a consumer, as is a comparison to the terms "dealer's cost" and "inventory price." Accordingly, it found the advertisement to be within the language and scope of the regulation.

At the hearing, the Division's only witness was Richard DeLorenzi, a retired investigator for the Office of Consumer Protection (OCP) and supervisor of the Automotive Section, who had been employed by the OCP for eight years. One of his duties at the OCP was to review motor vehicle advertisements and to determine whether they complied with the advertising regulations governing the sale of new automobiles.

DeLorenzi testified that he agreed with the Division's position, as set forth in answers to interrogatories, that the terms "dealer's cost," "inventory price," and "dealer invoice" are all synonymous. He further testified that in his experience the term "dealer's cost" has been used to signify the cost stated on the original invoice from the manufacturer to the dealer. However, he explained that this is not the final cost to the dealer of the vehicle.

> There are such things as holdbacks [2] which the manufacturer after the dealer pays for the cost of the vehicle on the invoice, the manufacturer sets aside a certain amount of money and then returns it to the dealer and the dealer gains anywhere from two to three percent of the value that was on the original invoice. So the invoice and the costs that they refer to on their advertisements is not a true cost.

DeLorenzi testified that in his opinion the term "dealer invoice" was just as likely to deceive consumers as were the terms set forth in the regulation. According to DeLorenzi, the evil of an advertisement that compares the sales price of an automobile to the dealer's cost lies in

---

[2] Both DeLorenzi and Joseph Waldman, a witness for Arrow, agree that a "holdback" is an amount of money that is held by General Motors and that is sent back to the dealership during the year.

> the fact that the cost that the dealer is using at the time is not the true cost of that automobile. The cost of the automobile is less than what he [the dealer] says the cost is. So therefore, the consumer public pays higher and they think they're getting it at cost when they really are not.

Similarly, according to DeLorenzi's testimony, the problem in using the term "dealer invoice" is that "the invoice that is given to the dealer is not the actual end of the run cost."

DeLorenzi's testimony was supported by an affidavit filed with the Administrative Law Judge by Patricia Royer, the Executive Director of the Division of Consumer Affairs, Office of Consumer Protection. Therein she stated that the regulatory provision in question "has been interpreted by the agency to preclude the use by any automobile dealer of any comparison of a selling price with the dealer's cost, inventory price *or terms of similar import or meaning* which is utilized by a dealer to indicate that the current selling price is being compared to the price which the dealer actually paid the manufacturer in the purchase of the car." (Emphasis added).

In her affidavit Royer specifically addressed the issue of the potential harm to a consumer that may result from the use of the term "dealer invoice" as a point of comparison:

> Such terms as dealer cost, dealer invoice, factory invoice, inventory price and other words of similar import or meaning employed throughout the industry are meaningless terms which do not accurately or adequately represent the price which a dealer actually paid for a specific automobile. In light of the fact that manufacturers offer rebates, "rollbacks" and other financial incentives to encourage increased sales, *it is difficult, if not impossible, to determine the actual price which a dealer pays a manufacturer for a car.* The final price is frequently not determined until the end of the model year, when the dealer's actual volume of sales have been ascertained. Hence, it is frequently impossible to determine *the price a dealer actually paid for a car at the time of the sale of an automobile to a consumer. In this context, any comparisons to dealer's cost, inventory price or words of similar import or meaning have consistently been viewed as being false, deceptive and potentially harmful to the consuming public.* [Emphasis added.]

Arrow's only witness was Joseph Waldman, Arrow's General Manager.[3] He testified that the terms "dealer's cost" and "inventory price" have no special meaning in the trade, but that "dealer invoice" was an inflexible term, not synonymous with the former two. "Dealer invoice is very simply an amount of money which the dealer pays for the automobile to the factory. And that is it. *There is no other—nothing else added or subtracted to come to a dealer invoice price.*" (Emphasis added). He emphasized that "[d]ealer invoice is not what the car costs us. * * * It is not the dealer cost."

Waldman stressed that it is difficult to determine what the ultimate cost of a car to a dealer will be because many items constituting "cost" are later recouped from the manufacturer. Among those items later recovered are the holdback amount, sales contest awards, and advertising expenses. He added that cost "can include many other things, both additions and subtractions, commissions, overhead expenses, * * * bonuses, advertising. * * * *They are not a part of a dealer's invoice.*" (Emphasis added).

On cross-examination, Waldman contradicted this testimony by defining invoice amount as "an amount which is really a factory item which takes holdback and some of these other items added to that invoice amount to get to an invoice total. * * * The cost of the car to me [Arrow] without any question is different from that invoice total amount." Moreover, Waldman admitted that it was possible that a consumer would not be aware that a dealer recoups the amount of holdback from the manufacturer, thus reducing the amount of "invoice total."

It is thus clear from the record that the term "dealer invoice" may be susceptible to the same misinterpretation by consumers as "dealer's cost" or "inventory price." As indicated by the testimony presented at the administrative hearing, disagree-

---

[3]After the hearing, Arrow introduced into the record an article entitled "The 1982 Cars—List Price v. Dealer Cost," 47 *Consumer Reports,* 194–95 (1982). This article was never made part of the record at the hearing but was introduced as part of the appeal to the Appellate Division.

ment exists among experts as to the precise definition of "dealer invoice." [4] Such confusion among consumers and experts is understandable when one examines an Arrow invoice such as the one introduced into evidence at the hearing. On that document the word "invoice" appears no fewer than four times—three times it appears as the term "invoice amount" and one time as the term "invoice total." All four references represent different dollar amounts. The invoice itself indicates that the dealer invoice may not reflect the true cost of the car to the dealer, for it bears the legend: INVOICE MAY NOT REFLECT THE ULTIMATE COST OF THE VEHICLE IN VIEW OF THE POSSIBILITY OF FUTURE REBATE ALLOWANCES, DISCOUNTS AND INCENTIVE AWARDS FROM MANUFACTURER TO DEALER. Waldman testified that confusion resulting from the use of the term "dealer invoice" could be alleviated if a customer asked to see the invoice document. At that time, Waldman suggested, the dealer could explain the various "invoice figures" on the document.[5]

■■ This subsequent clarification does not eliminate the possibility of consumer deception. None but the most sophisticated customers would ask to see the invoice, and if they did, those consumers would still not know whether the item "invoice amount" or "invoice total" was the "dealer invoice" referred to in the advertisement. Moreover, even if the consumer employed the correct "dealer invoice" figure as the point of comparison to the selling price, he may still be deceived. If

---

[4]Both parties also submitted letters to the Appellate Division in which they were unable to agree on the definition of "dealer invoice." The Division of Consumer Affairs reasserted that "dealer invoice" was not a uniform price charged all dealers in the same area by an automobile manufacturer for the same model car with the same equipment (as contended by Arrow) and that variations in the invoice price stem from differing rebates offered to various dealers. Arrow argued that the holdback was based on a fixed percentage, which did not differ from dealer to dealer.

[5]This position is likewise espoused by the dissent in the Appellate Division.

that consumer were to view the dealer invoice total advertised by Arrow as the final cost to Arrow of an automobile purchased from the manufacturer, he would mistakenly believe that his bargain is greater than it may actually be.

■ More importantly, however, we are dealing with whether the ad itself is misleading to the average consumer, not whether it can later be explained to the more knowledgeable, inquisitive consumer. *See Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,* —— *U.S.* ——, ——, 105 *S. Ct.* 2265, 2281, 85 *L.Ed.*2d 652 (1985) (in which the Supreme Court noted that

> it is a commonplace that members of the public are often unaware of the technical meanings of such terms as "fees" and "costs"—terms that, in ordinary usage, might well be virtually interchangeable. When the possibility of deception is as self-evident as it is in this case, we need not require the State to "conduct a survey of the ... public before it [may] determine that the [advertisement] had a tendency to mislead." (Citation omitted)).

The New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8–1 through –38, focuses on commercial deception. It declares as unlawful

> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission, of any material fact * * * in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby * * *. [*N.J.S.A.* 56:8–2.]

The Act was passed in response to widespread complaints about selling practices that victimized consumers, and thus was designed to prevent deception, fraud, or falsity, whether by acts of commission or omission, in connection with the sale and advertisement of merchandise and real estate. The Act is remedial and has been liberally construed in favor of protecting consumers.[6] *Fenwick v. Kay American Jeep, Inc.,* 72 *N.J.* 372, 376–77 (1977).

---

[6]Not only do we find Arrow's advertisement to be violative of *N.J.A.C.* 13:45A–2.2(a)7iv, but also violative of the enabling Consumer Fraud Act,

The Act empowers the Attorney General to "promulgate such rules and regulations" as shall be necessary to "accomplish the objectives and to carry out the duties prescribed by this act." *N.J.S.A.* 56:8–4. Pursuant to this authority, the Administrative Rules of the Division of Consumer Affairs were adopted. *N.J. A.C.* 13:45A–1.1 through –21.6. Subchapter 2 of these Administrative Rules was specifically enacted to govern motor vehicle advertising practices and became effective on July 15, 1973. Revisions of this subchapter became effective on November 17, 1976.

The 1976 amendments to the subchapter were intended to address deceptive advertising practices observed by the Division since the adoption of the original regulations in July of 1973. *Foreword, N.J.A.C.* 13:45A–2.1, –2.2. The major change effected by these amendments was the requirement that automobile advertising contain a single "bottom line" price so as to "provide the purchasing consumer with a meaningful disclosure as to the actual price to be paid for the vehicle as well as establishing a clear reference point for the purpose of comparing prices among competitors." *Foreword, supra.* The Division mandated that the amendments be construed and applied so as to achieve their underlying purpose of preventing the evils engendered by deceptive advertising, thus affording the consuming public forthright and honest presentations of motor vehicle information. *Id.*

██ It is axiomatic to this Court that "[t]he grant of authority to an administrative agency is to be liberally construed to enable the agency to accomplish the Legislature's goals." *Gloucester County Welfare Bd. v. N.J. Civ. Serv. Comm'n*, 93 *N.J.* 384, 390 (1983) (citing *United Bldg. & Constr. Trades Council v. Mayor of Camden*, 88 *N.J.* 317, 325 (1982));

---

inasmuch as the language employed by Arrow is capable of misleading or deceiving. As indicated, there is no requirement that the State prove that consumers have *actually* been deceived. *N.J.S.A.* 56:8–2.

*Levin v. Levin*, 179 *N.J.Super.* 193, 200 (App.Div.1981). The scope of appellate review of decisions of these agencies is also well established:

> Courts have a limited role in reviewing a decision of an administrative agency. Ordinarily, an appellate court will reverse the decision of an administrative agency only if it is arbitrary, capricious or unreasonable or it is not supported by substantial credible evidence in the record as a whole. [*Gloucester County, supra*, 93 *N.J.* at 391 (citation omitted).]

■ We find that there is substantial credible evidence to support the findings of the Division, affirmed by the judgment of the Appellate Division, that the term "dealer invoice" has no fixed, ascertainable meaning to the average consumer.[7] The holdbacks and other rebates subsequently recovered by the dealer imbue the term "dealer invoice" with the same defects sought to be avoided by the proscription against the "use in any advertisement of a comparison to the dealer's cost or inventory price"—that is, the cost as advertised is not the ultimate cost of the automobile to the dealer. In the context of the sale of new automobiles, we find that the terms "cost," "inventory," and "invoice" are equally amorphous, and hence equally misleading to the public.

■ Moreover, the regulation in question advances the goal of complete disclosure envisioned by the Legislature in enacting the Consumer Fraud Act. The average consumer purchasing an automobile today is exposed to a plethora of information relating to price and value. Because the purchase of an automobile represents a significant investment for most people, it is important that consumers be protected from misleading information. The regulation furthers the legislative intent underly-

---

[7]The dissent here and in the Appellate Division is based primarily on the belief that a dealer's invoice is a commonly-used term that has a fixed, generally-accepted meaning in the trade, as distinct from the terms "dealer's cost" and "inventory price." Relying on this premise, the dissenters hold that the proscription on the use of the term "dealer invoice" reduces a legitimate mode of competition and deprives the public of information that would be useful in shopping for a new automobile.

ing the Act by preventing the dissemination of misleading information to the public. Hence, we conclude that the term "dealer invoice," though not explicitly prohibited by *N.J.A.C.* 13:45A–2.2(a)7iv, comes within the scope and intendment of that regulation and the Act and that the advertisement is misleading and deceptive to the consuming public.

## II

Inasmuch as we find the advertisement to be misleading, we hold that the regulation does not infringe upon Arrow's First Amendment right to engage in commercial speech. In *Virginia Pharmacy v. Virginia Citizens Consumer Council*, 425 *U.S.* 748, 96 *S.Ct.* 1817, 48 *L.Ed.*2d 346 (1976), the United States Supreme Court held that the First Amendment, as applied to the states through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation. In *Virginia Pharmacy*, the Court held that a state could not prohibit all advertising by pharmacists of the prices of prescription drugs. The Court sought to promote the free flow of commercial information to consumers so that private economic decisions, in the aggregate, will be intelligent and well informed. *Id.*, 425 *U.S.* at 765, 96 *S.Ct.* at 1827, 48 *L.Ed.*2d at 360; *see also Bates v. State Bar of Arizona*, 433 *U.S.* 350, 97 *S.Ct.* 2691, 53 *L.Ed.*2d 810 (1977) (Court extended the rationale of *Virginia Pharmacy* to protect the advertising of prices of routine legal services).

■■ Nevertheless, both the United States Supreme Court and this Court have held that the United States Constitution accords less protection to commercial speech than to other constitutionally-guaranteed expression. *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 *U.S.* 557, 563, 100 *S.Ct.* 2343, 2350, 65 *L.Ed.*2d 341, 349 (1980); *Town Tobacconist v. Kimmelman*, 94 *N.J.* 85, 125 (1983). That protection applies only insofar as the speech conveys facts that facilitate honest commercial transactions.

[B]oth the U.S. Supreme Court and this Court have said "there can be no constitutional objection to the suppression of commercial messages ... more likely to deceive the public than inform it." *In re Professional Ethics Opinion 447*, 86 *N.J.* 473, 477 (1981), quoting *Central Hudson Gas v. Public Service Comm'n*, 447 *U.S.* 557, 563, 100 *S.Ct.* 2343, 2350, 65 *L.Ed.*2d 341 (1980). Moreover, "a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired." *Virginia Pharmacy*, 425 *U.S.* at 771, n. 24, 96 *S.Ct.* at 1830, n. 24. [*In re Professional Ethics Opinion 475*, 89 *N.J.* 74, 83–84 (1982).]

That protection has been reified by the Supreme Court in a four-part standard of review for commercial speech cases. *Central Hudson Gas, supra,* 447 *U.S.* 557, 100 *S.Ct.* 2343, 65 *L.Ed.*2d 341. In *Central Hudson,* the Supreme Court held a regulation of the New York Public Service Commission that banned advertising that promoted the use of electricity to be an unconstitutional violation of the First Amendment. The State of New York argued that the ban was adopted to serve the State's strong interest in conserving energy; the utility company contended that the absolute proscription prohibited advertising that would eventually lead to more efficient use of energy. To accommodate these competing interests in a First Amendment context, the Court propounded the following test:

At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest. [447 *U.S.* at 566, 100 *S.Ct.* at 2351, 65 *L.Ed.*2d at 351.]

Only if the first prong of this test is satisfied—that is, the commercial speech concerns lawful activity and is not misleading—does a case merit First Amendment protection and further analysis under the final three prongs.

The First Amendment's concern for commercial speech is based on the informational function of advertising. See *First National Bank of Boston v. Bellotti*, 435 *U.S.* 765, 783, 55 *L.Ed.*2d 707, 98 *S.Ct.* 1407 [1419] (1978). *Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity.* [*Id.* 447 *U.S.* at 563, 100 *S.Ct.* at 2350, 65 *L.Ed.*2d at 349 (emphasis added).]

The First Amendment "does not prohibit the State from insuring that the stream of commercial information flows *cleanly as well as freely* " through the imposition of restrictions on false, deceptive, and misleading commercial speech. *Friedman v. Rogers*, 440 *U.S.* 1, 9–10, 99 *S.Ct.* 887, 893–94, 59 *L.Ed.*2d 100, 110 (1979). Misleading advertising may be prohibited entirely. *In re R.M.J.*, 455 *U.S.* 191, 203, 102 *S.Ct.* 929, 937, 71 *L.Ed.*2d 64, 74 (1982).

In examining Arrow's claim that the regulation is unconstitutional, we apply the Supreme Court's *Central Hudson* test, which remains the leading criterion in determining the extent of protection due commercial speech.

■■ It is undisputed that Arrow's advertisement constitutes commercial speech and concerns lawful activity. However, the First Amendment does not protect speech that is deceptive or misleading; under the First Amendment, the states are free to ban forms of communication more likely to deceive the public than to inform it.

■■ As indicated, we find that the determination by the Division that the advertisement is misleading and deceptive to the consuming public is supported by sufficient credible evidence. The advertisement therefore fails to satisfy the first prong of the *Central Hudson* test and we need not consider whether the regulation satisfies the remaining three prongs. Accordingly, we hold that the regulation does not violate Arrow's First Amendment rights to engage in commercial speech.

### III

Similarly, we see little merit in Arrow's argument that the regulation is unconstitutionally vague. In *Grayned v. City of Rockford*, 408 *U.S.* 104, 107, 92 *S.Ct.* 2294, 2298, 33 *L.Ed.*2d 222, 227 (1972), the Supreme Court set forth the criteria to determine whether an administrative regulation is void for vagueness. The regulation must give fair notice to those persons potentially subject to it; it must adequately guard

against arbitrary and discriminatory enforcement; and it must provide sufficient breathing space for the exercise of First Amendment rights.

In *Hoffman Estates v. Flipside, Hoffman Estates,* however, the Supreme Court made clear that the standards for vagueness set forth in *Grayned* vary according to the nature of the enactment.

> These standards should not, of course, be mechanically applied. The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depend in part on the nature of the enactment. *Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.* Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. [455 *U.S.* 489, 498–99, 102 *S.Ct.* 1186, 1193, 71 *L.Ed.*2d 362, 371–72 (emphasis added).]

This Court has respected these distinctions in applying vagueness standards in different situations. *See, e.g., State v. Lee,* 96 *N.J.* 156, 167 (1984) (high standard of certainty applies to a vagueness challenge in a criminal case); *Town Tobacconist, supra,* 94 *N.J.* at 119 n. 16 (economic regulation called for a less stringent evaluation); *In re Hinds,* 90 *N.J.* 604, 618 (1982) (in which we stated that where a statute's literal scope is capable of reaching expression protected by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts).

In assessing whether a regulation is unconstitutionally vague, the court must consider whether "those to whom the statute applies * * * have a peculiar expertise in being able to assess the meanings of these terms." *In re Polk License Revocation,* 90 *N.J.* 550, 575 (1982). Those affected by commercial speech regulations are expected to review the relevant law beforehand, thereby receiving notice that a particular advertisement may be prohibited.

Here, Arrow, a sophisticated seller, had been penalized on three previous occasions for violating the advertising regula-

tions of the Division of Consumer Affairs. Arrow was aware of the advertising regulations and had ample opportunity to ascertain the nature of their prohibitions and act accordingly. After the publication of the regulations, there was a great deal of publicity both by the Division (New Jersey Register 481, Oct. 1975, p. 21) and by the New Jersey Automobile Dealers Association, which issued a publication called "Questions and Answers," concerning the new regulations. The Association diligently responded to questions about the scope of the regulations' application. Arrow could have inquired whether the new comparison regulation would apply to the term "dealer invoice." In light of the adequate notice provided to Arrow, we find the regulation is not rendered unconstitutionally vague by including the term "dealer invoice" within the ambit of *N.J.A.C.* 13:45A–2.2(a)7iv.

We likewise reject Arrow's overbreadth challenge. It is well settled that

> [t]he overbreadth doctrine strives to protect parties who are unlikely to seek judicial review of laws that unconstitutionally infringe on their freedom of expression. *Central Hudson,* 447 *U.S.* at 565 n. 8, 100 *S.Ct.* at 2351 n. 8, 65 *L.Ed.*2d at 350, citing *Broadrick v. Oklahoma,* 413 *U.S.* 601, 612–13, 93 *S.Ct.* 2908, 2915–16, 37 *L.Ed.*2d 830 (1973). The Supreme Court has noted, however, that those affected are apt to challenge overbroad laws that affect their commercial well-being—i.e., they do not need help from others. *Central Hudson,* 447 *U.S.* at 565 n. 8, 100 *S.Ct.* at 2351, 65 *L.Ed.*2d at 350. [*Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 125–26 (1983).]

Accordingly, it has been held that the overbreadth doctrine does not apply to commercial speech, *id.,* and, as such, Arrow's claim must fail.

## IV

In conclusion, we find that Arrow's advertisement is within the scope and intendment of *N.J.A.C.* 13:45A–2.2(a)7iv insofar as it is misleading and deceptive to the consuming public. We further find that the regulation is constitutionally valid in that it does not infringe on Arrow's First Amendment rights to

engage in commercial speech, and is not vague or overbroad. Accordingly, we affirm the judgment of the Appellate Division.

CLIFFORD and STEIN, JJ., dissenting.

We agree with Judge Botter, dissenting below, that the regulation in question, *N.J.A.C.* 13:45A–2.2(a)(7)(iv), is invalid. Appellant's advertisement refers to automobiles priced well below "dealer invoice," a term that the Court concludes is prohibited, despite the fact that the regulation nowhere refers to "dealer invoice." Instead, the regulation focuses specifically and exclusively on "dealer's cost" and "inventory price." As Judge Botter points out:

> The testimony in the case from Division's witness and appellant's witness established that "dealer invoice" is a commonly used term which refers to a document showing what the manufacturer has billed the dealer for a particular car. The term may be contrasted with the terms used in the regulation, "dealer's cost" or "inventory price," which have no fixed, generally accepted meaning in the trade. Whether respondent and its agents meant to equate dealer's cost and dealer invoice is immaterial; they did not expressly do so in the regulation, and the terms used in the regulation do not include a term of art in the trade, namely, dealer invoice. Thus, appellant should not have been found guilty of violating the regulation, whether or not it is lawful. [193 *N.J.Super.* 613, 624 (App.Div.1984) (Botter, J.A.D., dissenting) (footnote omitted).]

But beyond that,

> [t]he means used by the regulation—a total ban on advertising in relation to the dealer's invoice price—is excessive. It applies a remedy that is worse than the disease. If car buyers do not know that the dealer invoice price does not show the actual cost to the dealer, the regulations could simply require advertisements to announce that fact. It is advantageous for buyers to know *at least* the amount of the dealer's invoice price. If the fear is that they will not avail themselves of information in the public domain, namely, that dealer invoice price does not mean actual cost, a simple remedy can be supplied by tailoring the regulation to meet this need. It is worth repeating that the invoice in evidence contains this notice to prospective buyers. The invoice also shows the "memo amount less H/B & Adv," as $5,262.92 in addition to the "Invoice Total" of $5,566.81. Thus, a buyer who examines the invoice—the regulation can also require that the invoice be given to the buyer when dealer-invoice advertising is employed—would be able to compare the initial dealer-invoice price with the net invoice charge to the dealer. Whether contained on the invoice or not, the regulation can require that buyers be advised of holdbacks, rebates and other discounts from dealer invoice price. After all, buyers normally do not expect

dealers to sell cars at cost. Everyone knows that a retail seller must have a markup over cost to stay in business. The idea that this regulation is needed to protect the public is fanciful. The record before us does not justify giving uncritical deference to the supposed expertise of Division on this subject. [*Id.* at 627.]

That makes eminent good sense to us. Moreover, the interests of consumer protectionism do not demand that automobile dealers be treated as sharpsters or charlatans. The selling techniques employed here—particularly if modified consistent with Judge Botter's suggestion for expanding the regulation and making it more specific—would serve to enlighten the prospective buyer, to assist him in making rational choices, and to give a basis for comparison shopping. We therefore endorse Judge Botter's final reasons for declaring the regulation invalid:

It suppresses useful information; the means chosen to avoid misconceptions unduly encroaches on rights of free speech; and the remedy for the perceived danger of deception is to require more disclosure rather than the suppression of relevant information. The regulation stifles a legitimate, honest means of competition and deprives the public of the benefit of truthful advertising. [*Id.* at 628–29.]

We vote to reverse.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN and GARIBALDI—5.

*For reversal*—Justices CLIFFORD and STEIN—2.